STATE, Plaintiff, v. HERSH, Defendant.

*No. State 22 (1974). Argued June 2, 1976.—Decided June 30, 1976.*
(Also reported in 243 N. W. 2d 178.)

For the plaintiff there were briefs and oral argument by *Robert H. Bichler* of Racine, counsel for the Board of State Bar Commissioners.

For the defendant there was a brief by *Robert E. Cook* and *Cook & Franke, S. C.* of Milwaukee, and oral argument by *Robert E. Cook.*

PER CURIAM. The defendant is fifty years old. He was admitted to the practice of law in Wisconsin on

September 5, 1950. He has practiced in the city of Milwaukee. He now lives in Prescott, Arizona.

*Count I.*

This court alleges that the defendant, as attorney and personal representative of the estate of Peter Plovch, misappropriated funds belonging to this estate and then altered bank statements in an attempt to cover up his prior misappropriations. The facts on the first count were essentially admitted by the defendant in his answer.

Peter Plovch (also known as Peter Plovech) died testate on March 7, 1970. His will, which had been executed in 1969, named the defendant as personal representative. The three children of George Dreske, a client and associate of the defendant, were named as beneficiaries in the will. The will was admitted to probate in Milwaukee county court in October, 1970.

The gross value of the estate was $8,418.58 and consisted mainly of a savings account in Plovch's name. The defendant transferred the funds in this account to a checking account at the Bank of Milwaukee entitled "Estate of Peter Plovch." On two occasions in November of 1970, he withdrew $2,000 and $2,500 from this account and deposited these sums in his personal account at the Midland National Bank. In December of 1970, he withdrew another $2,500 from the account and deposited it in his account.

Eventually the beneficiaries demanded an accounting and the closing of the estate. They also retained Gerald Starr as an attorney. In response to these proddings, the defendant wrote to Attorney Starr on March 28, 1972, enclosing purported copies of the estate bank account which showed only the original deposits and a few minor disbursements. Defendant fraudulently altered the bank statements in order to conceal the three withdrawals which he had made and the subsequent deposits made in

August of 1971 and February of 1972 to replace the withdrawn funds.

The referee properly rejected the "defense" presented by the defendant to justify these actions. Hersh testified that his client, George Dreske, directed him to prepare a will in the name of Peter Plovch, who was an elderly man living in a house near a junkyard owned by Dreske. Dreske's directions were that the will should name his three children as beneficiaries of Plovch's estate. Hersh prepared such a will without ever speaking to Plovch about his testamentary intentions. He did so knowing that Plovch had practically no assets and in spite of the fact that he "figured it was George's money and he was giving it to his kids, tax free, you know." His explanation for preparing a will under such suspicious circumstances was that "I did what I was told." His surmise that this whole scheme was a tax dodge by Dreske was confirmed in September of 1970 when Dreske came into his office and stated that he was not going to pay him fees in order to get his own money back. In spite of this statement, Hersh filed a petition in probate in October of 1970 in which he stated that Plovch owned the funds in question. Hersh testified that he subsequently loaned some of the Plovch-Dreske money to one Kenneth Wakefield. Wakefield had been Dreske's partner, but had a falling out with Dreske and was ill and in need of funds. Hersh testified that he lent Wakefield some of the trust funds because he felt sorry for Wakefield.

Assuming this bizarre story were true, it would not constitute a defense to the charges because the use of trust account funds for loans to friends is obviously prohibited. Hersh's attempted justification of his conduct compounds the original misconduct.

The referee found that the state had shown by clear and convincing evidence that the defendant was guilty of unprofessional conduct by these acts of mis-

appropriation and fraud. We agree. These actions show a gross disregard of the defendant's duties as personal representative and as attorney and cast serious doubt upon defendant's moral fitness to practice law.

*Count II.*

The original complaint alleged that the defendant had repeatedly converted clients' trust account funds to his own use between September of 1966 and June of 1969. Twenty separate checks were listed as examples of the defendant's continuous pattern of misappropriation during this period.

The defendant maintained a trust account for clients' funds at the First Wisconsin Bank in Milwaukee during the time in question. Among the clients whose funds were deposited in this account were Lois Jankech, Leland Baum, Roto-Rooter Company and Elsie Biesek.

On August 24, 1966, the sum of $8,260.43 was deposited in the defendant's trust account for Lois Jankech. This same sum was paid out to Lois Jankech by a check dated December 2, 1968. Thus the defendant's trust account should have had a balance of at least $8,260.43 at all times between August 24, 1966 and December 2, 1968 in the name of Lois Jankech.

On April 17, 1967, the sum of $6,625.67 was deposited in the trust account by Leland Baum. On July 25, 1968, the sum of $5,000 was paid to the United States on behalf of Baum. Even if one assumes that the difference between these sums ($1,625.67) represents the defendant's fees, $5,000 of the Baum money should have been on deposit in the trust account between April 17, 1967 and July 25, 1968.

The trust account receipt book further shows that $12,690 was deposited on July 24, 1967 on behalf of the Roto-Rooter Company. $1,200 of this sum was paid to the defendant's office account on March 26, 1968, apparently as legal fees. By a check also dated March 26,

1968, the remainder of $11,490 was paid out to Roto-Rooter. Between July 24, 1967 and March 26, 1968, therefore, the trust account should have contained $11,490 of Roto-Rooter money.

The evidence is overwhelming, however, that between September of 1966 and March of 1968 the balance in the trust account was substantially less than the total of clients' funds entrusted to the defendant for safekeeping. For example, check stub number 1015 shows that on December 21, 1967 there was an *overdraft* of $228.88, when there should have been $24,750.43 of Jankech, Baum and Roto-Rooter monies in the account. Similarly, check stub number 1194 shows that on July 11, 1968 there was an *overdraft* of $12,853.11, when there should have been $13,260.43 of Jankech and Baum monies on deposit.

The evidence was also overwhelming that during this same period funds were regularly disbursed to the defendant personally, either without notation or with the notation "for loan." The defendant testified that, if a trust account disbursement was for legal fees, the check was made out to his office account and not to him personally. Trust account checks were also frequently made out to creditors and to friends of the defendant. The reasonable inference is that the major discrepancies described above were due to a continuous pattern of misappropriation and conversion by the defendant.

The record clearly established the connection between unauthorized payments to the defendant and major deficits in the trust account.

The referee found that the "defendant was repeatedly guilty of using for his personal purposes funds entrusted to him by his clients." A review of the record discloses that this finding is fully supported by clear and satisfactory evidence.

■ The amended complaint also alleged that the defendant had commingled his personal funds with those of

his clients in the clients' trust account in violation of sec. 256.293 (1), Stats. In an unsuccessful attempt to justify the regular payments to himself from the trust account, the defendant freely testified that on at least four occasions he had deposited his own money in the trust account. The evidence supports these admissions by the defendant. Receipt number 8236 in the trust account receipt book shows that on July 27, 1967 the defendant deposited $6,000 in the trust account which he testified represented the repayment of a loan he had made to Leland Baum. Receipt number 8344 shows that on January 13, 1968 one "R. Jorgensen" deposited $10,500 in the trust account which defendant testified was the proceeds of a personal loan which he and Jorgensen had made from a local bank. On March 14, 1968 receipt number 8385 shows a deposit by the defendant of $11,000 which he testified represented the proceeds from the sale of a Cleveland trencher owned by him. Finally, receipt number 8387, dated March 15, 1968, shows a deposit by the defendant of $27,000 which he testified was a settlement received by a corporation which he owned. In each case the defendant gave reasons why he had deposited these personal funds in the trust account, but none of these reasons justify the acts of commingling. In fact, the defendant admitted that the proper procedure for deposit of any funds in which he had a personal interest would have been to open a separate account and not to mix these funds with clients' funds. The referee's finding that the defendant was "guilty of commingling his personal funds with funds which he held in trust for clients" is supported by clear and satisfactory evidence in the record.

Counsel for defendant attacks the procedure whereby the complaint was amended to include this charge of commingling. The original complaint, served on April 15, 1974, charged that the defendant was guilty of conversion of trust account funds. When it became apparent

at the hearings held on June 10 and June 11, 1975, that the defendant's defense strategy was to testify that his use of trust account funds was justified because some of the trust account deposits were his own personal funds, counsel for the Board of State Bar Commissioners moved to amend his complaint to include an allegation of commingling. He then spoke by telephone with four members of the Board and received their approval for the amendment. The referee granted the motion to amend, on the condition that counsel for the Board produce a written affidavit that he had the authority of three members of the Board to make the amendment. The referee also granted counsel for defendant an adjournment until July 31, 1975, so that he could prepare to defend against the allegations of commingling. On July 23, 1975, counsel for the Board served upon the defendant a formal motion to amend the pleadings to conform to the proof and to add the charge of commingling and a written affidavit stating that approval for this amendment had been received from four members of the Board and that the entire Board has approved the amendment at its June 27, 1975 meeting. Counsel for defendant presented his defense against both conversion and commingling at the July 31, 1975 hearing.

Defendant now claims that he was denied his constitutional right to due process by these procedures. We find no merit in this claim. The statutory procedure, which was designed to insure due process of law, was followed. Sec. 256.283 (6), Stats., provides in relevant part as follows:

". . . Upon motion by counsel for the board made at any time prior to the conclusion of the hearing, and upon just cause, the referee may permit the amendment of the complaint to include matters brought to the board's attention after the filing of the complaint and upon counsel filing an affidavit that he has had prior approval of such amendment by 3 or more board members. If

such motion be granted, the referee shall grant such adjournments and further orders as he may deem necessary in the interest of justice. . . ."

The above statutory provision was strictly followed in this case and defendant was not denied due process.

■ Counsel for defendant makes much of the brevity of the telephone communications between counsel for the Board and members of the Board during the June 11, 1975 hearing. However, defendant's constitutional right to due process in this instance encompasses only his right to prior notice of charges, his right to prepare to defend these charges and his right to a full hearing on these charges. All of these rights were duly protected by the adjournment of the hearing to July 31, 1975. Defendant's rights were not prejudiced in any manner by the amendment of the complaint to include commingling.

*Count III.*

The complainant also charged the defendant with unprofessional conduct for refusal to produce all subpoenaed trust account records. The defendant testified that he had produced all the records he had and that some of his trust account records had been destroyed in an automobile accident which occurred in September of 1974 as he was moving his possessions to Arizona. He produced an insurance document which showed that a claim had been paid him for an accident during this period. In addition, the state conceded that it had the subpoenaed records in its possession from January 1974 until April 1974, and that it had either not copied the records or had lost the copies it had made.

■ The referee concluded that the state had failed to show a wilful refusal to produce trust account records by clear and satisfactory evidence, and recommended that this count of the complaint be dismissed. We agree with that recommendation. It is noted that sec. 256.293 (2), Stats., which requires that lawyers preserve their trust

account records for six years and that they submit them to the Board for its inspection and audit or be liable to disciplinary action was not effective until after the facts which gave rise to this action occurred. *In the Matter of the Revision of Rules Governing Discipline of Attorneys,* effective January 12, 1971, 48 Wis. 2d vii, xvi.

This court has recently pointed out its "concern with trust fund abuses," and has emphasized "the serious nature of improprieties involving clients' funds and trust account funds." *State v. Aldrich* (1976), 71 Wis. 2d 206, 210, 211, 237 N. W. 2d 689. In this case the abuses are especially aggravated because they occurred continuously over a three-year period and were clearly perpetrated as a result of a conscious plan and not merely out of negligence or incompetence.

We conclude that the evidence clearly and satisfactorily establishes that the defendant is guilty of unprofessional conduct. The conclusion warrants suspension of the defendant's license to practice law in this state.

Therefore, it is ordered and adjudged that the license of defendant Frederick Hersh be and is hereby suspended for a period of two years from the entry of this order, and for such period thereafter as shall expire before his license is restored. Such restoration and reinstatement as a member of the state bar is conditioned upon (1) his paying the costs of these proceedings (not to exceed $2,000); (2) his petitioning for reinstatement under Rule 10, sec. 5 of the Rules and By-Laws of the State Bar of Wisconsin.

It is further ordered that the State Bar of Wisconsin notify the courts of record of these orders by sending each a copy thereof.

It is further ordered that Frederick Hersh notify his respective clients now represented by him in all matters involving the practice of law or all matters pending in any court of this state that his license to practice law in this state is now suspended.