IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Jill S. GILBERT, Attorney at Law.

BOARD OF ATTORNEYS PROFESSIONAL RESPONSIBILITY,
Complainant-Respondent,

v.

Jill S. GILBERT, Respondent-Appellant.

Supreme Court

*No. 95–3561–D. Oral argument February 12, 1999.—Decided
July 2, 1999.*

(Also reported in 595 N.W.2d 715.)

For the respondent-appellant there were briefs by *Daniel W. Hildebrand* and *DeWitt, Ross & Stevens, S.C.*, Madison and oral argument by *Daniel W. Hildebrand*.

For the complainant-respondent there was a brief by *Thomas J. Basting, Sr.* and *Brennan, Steil, Basting & MacDougall, S.C.*, Janesville and oral argument by *Thomas J. Basting, Sr.*

¶ 1. PER CURIAM. Attorney Jill Gilbert appealed from the referee's conclusions that she engaged in professional misconduct during her representation of a client over a six-month period. That misconduct consisted of submitting bills to the client that contained misrepresentations and were fraudulent, misrepresenting her use of her client's funds to purchase a television for herself, engaging in dishonesty, fraud, deceit or misrepresentation in videotaping what purported to be the client's execution of an agreement, charging the client and paying herself excessive and unreasonable fees from the client's funds, failing to act with reasonable diligence and promptness in handling the client's checking account, failing to keep the

client reasonably informed of the status of his financial affairs and explain them to the extent reasonably necessary for him to make informed decisions, and depositing funds she claimed as fees into her client trust account and subsequently withdrawing a portion of those funds knowing there was a dispute about her entitlement to them. Attorney Gilbert also appealed from the referee's recommendation that her license to practice law be suspended for three years as discipline for that misconduct and that she be required to make restitution to the client, in the amount of $84,800, plus interest, for the excessive and unreasonable fees she charged and collected.

¶ 2. We determine that the referee's conclusions in respect to Attorney Gilbert's professional misconduct were properly drawn from the facts established in the disciplinary proceeding. We determine further that the egregiousness of that misconduct, in light of all the circumstances, warrants the suspension of Attorney Gilbert's license to practice law for two years. For services rendered over a period of less than six months, she charged her client and paid herself $112,000 from his funds under her control—more than one-third of the client's total assets, excluding his residence. Moreover, she was repeatedly dishonest: her billing statements submitted to the client misrepresented services she had performed for him as well as the dates on which she performed them; she misrepresented her use of a cashier's check drawn on the client's funds to purchase a television for her family; after the client terminated her employment, she took client funds from her trust account to pay what she claimed were fees owing for services rendered, notwithstanding that she had been notified by the client's successor attorney of a

dispute over the services she claimed to have rendered and the amount of fees to which she was entitled.

¶ 3. In addition to the suspension, we order Attorney Gilbert to make restitution to her client in the amount determined by the referee to be the excessive fees she charged and collected. The referee based that determination on the expert testimony presented at a hearing held on the issue of restitution. Also, as the referee recommended, interest on the amount of restitution is to be paid at the legal rate from the date her representation of the client was terminated.

¶ 4. Attorney Gilbert was admitted to the practice of law in Wisconsin in June 1992 and practices in Milwaukee. She previously had practiced law for several years in Illinois. She has not been the subject of a prior disciplinary proceeding.

¶ 5. The referee, Attorney Rose Marie Baron, made findings of fact based on testimony and documentary evidence presented at a lengthy disciplinary hearing concerning Attorney Gilbert's representation of a client from March 4 to August 16, 1993. The client was a 63-year-old man who suffered from congestive heart disease and chronic depression, for which he had been receiving disability benefits. Following a heart attack in January 1993, the man was kept in a nursing home when he was unable to arrange for necessary home care. When his attorney no longer was willing to represent him, as he was a very demanding client, Attorney Gilbert agreed to take on the representation. At the time, the client had a stock portfolio valued at $254,000, a condominium unit where he resided valued at $95,000, and a wristwatch collection valued at up to $75,000.

¶ 6. On March 4, 1993, Attorney Gilbert met with the client at the nursing home and entered into a fee

agreement by which she was to manage his financial affairs, determine his rights concerning hospitalization and nursing home care, and identify alternatives for payment of the medical and nursing home services he needed, for which she was to be paid at the rate of $125 per hour. Soon thereafter, however, when the client gave Attorney Gilbert his durable power of attorney and his power of attorney for health care, one copy of the durable power set forth a $95 hourly fee and another copy specified a $150 hourly fee. In any event, the check the client gave Attorney Gilbert April 15, 1993, for her services bore the notation "37 hours at $95."

¶ 7. The client returned to his home March 24, 1993, and received home health care services—skilled nursing for his medications, daily visits from a health aide, laundry, transportation, and cleaning services. When Attorney Gilbert had a nursing care evaluation done with a view toward the client's being as independent as possible, the evaluator stated on April 5, 1993, that he did not need a night-time companion and suggested occupational and physical therapy and home meal delivery. The evaluator's recommendation for psychological testing to determine the client's ability to make sound judgments for continued independent living was not followed.

¶ 8. Over the ensuing several months, the client was hospitalized three times: from April 23–30 for hypertensive cardiovascular disease with congestive heart failure; June 28–July 7 for confusion and paranoia; from July 22–28 for fainting spells. During that time, Attorney Gilbert served as liaison with the client's physician, caregivers, and case managers.

¶ 9. The handwritten records Attorney Gilbert kept of her time spent on the client's representation

448

from March 3 to 30, 1993, reflected in two columns the time spent and services provided "in office" and "out of office," but the typed statement of her services she gave the client and had him sign did not set forth the total of hours spent or the fee for those services. Attorney Gilbert produced no handwritten records of her time and charges in the client's representation after March.

¶ 10. Sometime after the client signed the March statement, Attorney Gilbert gave him a revised statement of those services, this time including the hours set forth in her handwritten notes under the column "out of office." That revised statement, which the client signed July 1, 1993, showed a balance due of $16,200 but did not set forth the total number of hours spent on his representation or the rate at which the fee was calculated. The referee noted that Attorney Gilbert could not have billed those services at the $125 hourly rate specified in the fee agreement, for if she had, the fee would have been $17,950.

¶ 11. The next three statements for Attorney Gilbert's services, each of which, except the June 30 statement, she had the client sign, set forth the following totals:

| | | |
|---|---|---|
| 4/93: | 128.6 hours | $16,075.00 |
| 5/1 - 5/19: | 123.9 hours @ $125 | $15,487.50 |
| 5/20 - 5/31: | 41.7 hours @ $125 (less unspecified $523 credit) | $ 4,689.50 |
| 6/1 - 6/15: | 99.4 hours @ $125 | $12,425.00 |
| 6/16 - 6/30: | 117.3 hours @ $125 (less $1200 credit for purchase that was returned) | $13,462.50 |
| 7/1 - 7/7: | 57.1 hours @ $125 | $ 7,137.50 |
| 7/8 - 7/31: | 136.3 hours @ $125 | $17,037.50 |

¶ 12. After the client filed a grievance against Attorney Gilbert with the Board of Attorneys Professional Responsibility (Board) August 16, 1993, terminated her representation, and retained another attorney, Attorney Gilbert's final bill to the client, dated August 20, 1993, which he did not sign, set forth the following:

| | | |
|---|---|---|
| 8/1 - 8/17: | Estimated fee per accounting | $12,387.50 |
| | Total actual hours 76.2 @ $125 | $ 9,525.00 |
| | Balance due to client | $ 2,862.50 |

¶ 13. On May 23, 1993, Attorney Gilbert had written the client that she was concerned that at the rate he was paying for her services, his assets soon would be depleted. She proposed to limit her services to 35 hours per week for June and July and to 30 hours per week for August and September. Her June 10, 1993 letter to him summarizing deposits and withdrawals of his funds in her trust account showed a withdrawal for fees of $44,443 for April and May, even though her individual statements for the relevant period totaled only $36,252.

¶ 14. In early June 1993 Attorney Gilbert looked into the possibility of having her client enter the Community Options Program (COP), a state program providing assistance to persons needing care in order that they might remain in their home. In addition to an asset limit, there was a two-year waiting period to obtain COP benefits, and owing to recent legislation, the client would have to qualify for those benefits by October 1, 1993.

¶ 15. Attorney Gilbert discussed with the ethics advisor at the State Bar of Wisconsin ethical issues relating to a contemplated asset divestment plan to

render her client eligible for COP. At the advisor's suggestion, she consulted an attorney experienced in ethical issues and gave him details of a plan she had devised that included placing the client's funds in her own account. When she met with that attorney June 28, 1993, he discussed with her the professional conduct rules concerning an attorney's entering into a business transaction with a client.

¶ 16. When told of the agreement she was contemplating by which she would provide her client legal services and health-care-related case management services, the attorney advised Attorney Gilbert of the need to explain the matter fully to her client, give him available options, suggest he have independent counsel review any proposed agreement, ensure that her fees were reasonable, obtain her client's written consent, and provide for a refund of fees in the event the client terminated her services. The attorney told her that if divestment of the client's assets was intended, she should not deposit the client's funds in her trust account. He also suggested that if the client were under a disability, she videotape the client's execution of the agreement.

¶ 17. That attorney also suggested that Attorney Gilbert arrive at a "blended" rate for her professional and nonprofessional services under the agreement, as charging a legal fee for personal services would not be reasonable. Attorney Gilbert stated that attorneys practicing in the area of elder law charged up to $165 per hour and that fees for non-legal case management services ranged from $70 to $90 per hour. The attorney assisted Attorney Gilbert on several drafts of the agreement she was preparing but never saw the final copy she gave the client to sign.

¶ 18. The case management agreement provided that the client give Attorney Gilbert $154,000 to be deposited into a joint bank account held by Attorney Gilbert and the client. It provided further that within 14 days of deposit Attorney Gilbert withdraw 65 percent of the amount and place it in a segregated account for payment of the client's care and retain 35 percent to pay estimated federal and state income tax obligations she expected to incur personally as a result of receiving the client's funds. Under the agreement, Attorney Gilbert was to provide up to 30 hours of services per week—with a 24-hour per day availability—for 24 months and be responsible for ensuring that the client's 24-hour-a-day care needs were met. By its terms, the agreement would terminate when the client's expenses exceeded the segregated and reserved funds.

¶ 19. The agreement provided that Attorney Gilbert's total fee for lawyer and case management services would vary depending on the client's date of eligibility for COP or for Medicaid benefits. If the agreement were terminated prior to September 15, 1993, Attorney Gilbert would refund all funds in excess of what she would be entitled to for services rendered, at a rate of $125 per hour.

¶ 20. On July 20, 1993, Attorney Gilbert video-taped what purported to be her explanation of the agreement to the client, his consent to its terms, and his execution of it. In fact, however, at the time the videotape was made during Attorney Gilbert's meeting with the client at his home, the client already had signed the copies of the agreement she had given him. When the time came for the client to sign the agreement, Attorney Gilbert stopped the taping, and when it resumed she instructed the client to sign his name on a

line that in fact already bore his signature. The referee described the videotape in her report as follows:

> [The client] is shown on the tape as a man who has obvious physical and cognitive problems. . . . He has noticeable tremors, has a flat affect, responds slowly, and has periods of confusion. He is asked to review a complex document prepared by his attorney, indicate his understanding, and sign the agreement giving his attorney control of all his assets.
>
> . . .The setting for this important procedure is in [the client's] apartment and is conducted under extremely chaotic circumstances. . . .
>
> . . .Ms. Gilbert came to [the client's] apartment accompanied by her two very young children who are shown on the videotape running, screaming, vying for Ms. Gilbert's attention, and interrupting her discussion with [the client]. The television set in the living room where the meeting is being conducted is tuned in resulting in a loud, distracting background noise and motion. [T]he housekeeper is seated in the room, and persists in prompting [the client] when he is unable to answer some of Ms. Gilbert's questions.
>
> In addition to the cacophony, which in and of itself makes meaningful dialogue nearly impossible, Ms. Gilbert's rapid speech when she addresses [the client] creates further difficulty. It is very hard for an ordinary viewer to follow as she races from topic to topic at an accelerated pace; for someone in [the client's] condition and with his limited cognitive grasp, it can only be more of an ordeal. He looks dazed much of the time and rarely makes a declarative statement; Ms. Gilbert puts words in [his] mouth. He responds in a rote fashion, says "yes" when she asks him specific questions, but shows no real comprehension—he reacts, but is not able by

453

virtue of her manner of questioning him, to express his own understanding of the various topics raised. Because of the form of Ms. Gilbert's questions, [the client] has no other way to respond but to say "yes" or nod his head in acquiescence.

. . .Most astounding was the revelation that [the client] had already signed several copies of the agreement prior to the videotaping. And what does Jill Gilbert do when she sees that this has occurred? Not what one would expect from an attorney whose intent is to memorialize the execution of a significant document to avoid any potential challenge of the client's competence to enter into an agreement. She pages through the documents, sees that they are already signed, and then pretends that there is no problem. She then turns the camera off for an indeterminate time. When taping resumes, Ms. Gilbert is heard directing [the client] to sign his name "right above the line" and "fill in the date."

That the respondent continued to record this charade is unconscionable. That she would rely on the videotape to show that her client understood the many complex provisions of the document, i.e., divestiture, tax, fees, termination, et al., is in reckless disregard of her responsibility to her client.

¶ 21. Prior to the signing of the agreement, the client had authorized Attorney Gilbert to liquidate $37,000 of his stock brokerage account and place the proceeds in her client trust account for payment of his care and for her legal services. Attorney Gilbert liquidated $46,800 from that account and then transferred the account to another broker. Soon thereafter, she liquidated $90,000 from that account and transferred it to a newly created joint trust checking account in her and her client's names. On July 19, 1993, one day before the case management agreement was to be executed, she transferred $74,380 from the brokerage

account to the joint account and nine days later withdrew approximately $110,000 from the joint account and placed it in her law office business account. On August 10, 1993, she opened a trust account for the client's funds and placed in it $24,000 from the joint trust account, representing that amount as payment of fees she already had earned. After being informed that the client filed a grievance with the Board, Attorney Gilbert withdrew $10,800 from the client trust account as fees for services she claimed she had rendered prior to the execution of the case management agreement.

¶ 22. The referee also made findings in respect to Attorney Gilbert's handling of her client's affairs and personal needs. In early June 1993 she was told that the client's large screen television was not working. After going to his residence and trying unsuccessfully to turn on the television using the remote control, she obtained a $3000 cashier's check written on her client's funds payable to an appliance store and went shopping for a replacement television. When a salesman at the store suggested that the problem might be only the need for new batteries in the remote control, Attorney Gilbert bought new batteries, returned to the client's home, and was able to operate the television with the remote control. She later returned to the store and used the $3000 cashier's check to buy a large screen television for herself and her family.

¶ 23. Attorney Gilbert entered in her client trust account check register an unidentified deposit of $3000 and an unidentified withdrawal in the same amount, subsequently claiming that it constituted a $3000 credit to her client as partial payment of her legal fees connected to her use of the cashier's check. The accounting she prepared for the client's successor attorney after her services were terminated showed a

$3000 "credit for unused money order" and a $3000 payment directly to her by an unidentified client check.

¶ 24. In another matter, while Attorney Gilbert was representing the client and taking care of his financial affairs, she allowed his personal checking account to become overdrawn for a period of two months. The overdrawn status resulted from her having used the client's debit card to make purchases for him believing that it was a credit card. Also, when going through the client's files after Attorney Gilbert's representation was terminated, the client's successor attorney found a Medicare check to the client postmarked May 1993 that had not been deposited into his account.

¶ 25. On the basis of the foregoing facts, the referee concluded that Attorney Gilbert engaged in professional misconduct as follows.

¶ 26. — Engaged in dishonesty, fraud, deceit, or misrepresentation, prohibited by SCR 20:8.4(c),[1] by the following:

— Her fraudulent billings and the misrepresentations in them for services she claimed to have rendered while her client was hospitalized and in respect to meetings with her client that did not occur.

— Misrepresenting the facts concerning her use of the $3000 cashier's check drawn on client funds to purchase a television set for her own use.

---

[1] SCR 20:8.4 provides, in pertinent part:

**Misconduct**

It is professional misconduct for a lawyer to:

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

— Offering to the Board during its investigation a videotape of what purported to be her client's execution of the case management agreement, when the client already had signed the agreement — a fact Attorney Gilbert attempted to conceal during the taping.

¶ 27. — Charged and collected excessive and unreasonable fees, in violation of SCR 20:1.5(a)(1).[2]

¶ 28. — Failed to act with reasonable diligence and promptness in managing her client's financial affairs, in violation of SCR 20:1.3,[3] by allowing his checkbook to become overdrawn and by failing to deposit a Medicare reimbursement check to his account.

¶ 29. — Failed to keep her client reasonably informed of the status of his financial situation and explain the provisions of the case management agreement in a manner that would permit him to make informed decisions regarding them, in violation of SCR 20:1.4(a) and (b).[4]

---

[2] SCR 20:1.5 provides, in pertinent part:

**Fees**
(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

[3] SCR 20:1.3 provides:

**Diligence**
A lawyer shall act with reasonable diligence and promptness in representing a client.

[4] SCR 20:1.4 provides:

**Communication**
(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

¶ 30. — Failed to keep her own funds separate from her client's, in violation of SCR 20:1.15(a),[5] by transferring from a joint account to her client trust account $24,000 that she characterized as fees earned prior to the execution of the case management agreement.

¶ 31. — Withdrew funds from her client trust account as fees while a dispute existed regarding her services, in violation of SCR 20:1.15(d).[6]

¶ 32. The referee concluded that the Board was unable to establish by clear and satisfactory evidence

---

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

[5] At the time relevant here, SCR 20:1.15 provided, in pertinent part:

**Safekeeping property**
(a) A lawyer shall hold in trust, separate from the lawyer's own property, property of clients or third persons that is in the lawyer's possession in connection with a representation. All funds of clients paid to a lawyer or law firm shall be deposited in one or more identifiable trust accounts as provided in paragraph (c) maintained in a bank, trust company, credit union or savings and loan association authorized to do business and located in Wisconsin, which account shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import, and no funds belonging to the lawyer or law firm except funds reasonably sufficient to pay account service charges may be deposited in such an account. . . .

[6] SCR 20:1.15 provides, in pertinent part:

**Safekeeping property**
. . .
(d) When, in the representation, a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be treated by the lawyer as trust property until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall continue to be treated as trust property until the dispute is resolved.

458

four other allegations of professional misconduct: Attorney Gilbert's using her client's credit card to purchase items that were not for his benefit, liquidating some of her client's stockholdings and depositing the proceeds into a joint account prior to the execution and in violation of the case management agreement, retaining the client's funds to make a substantial estimated tax payment after she learned that the payment would not be required, and creating a conflict between her client's interests and her own by setting up by the case management agreement for payment of the client's health care and other needs as well as her fees. In respect to the first of those, while the testimony was unchallenged that Attorney Gilbert purchased a video cassette recorder, a dehumidifier, and cologne with her client's credit card, there was contradictory evidence as to whether the client ever received the dehumidifier, despite Attorney Gilbert's testimony that she delivered it to his residence. In respect to the cologne, the referee noted Attorney Gilbert's contradictory statements to explain the appearance of the purchase on the credit card bill. While noting that Attorney Gilbert's explanation to the client's successor attorney about the purchase "leads to the conclusion that Ms. Gilbert has a penchant for deceitful behavior," the referee concluded that there was no clear and convincing evidence to establish that she did not purchase the cologne for her client.

¶ 33. Regarding the transfer of the client's funds to the joint account prior to the execution of the case management agreement, the referee found that Attorney Gilbert was acting under a pre-existing power of attorney. As to the conflict of interest created by the case management agreement, the referee acknowledged that there might be an appearance of a conflict

but found that Attorney Gilbert had a reasonable belief that her representation would not be affected by the fact that her expenditure of the client's funds for his health care and other needs would reduce the amount available for payment of her fees. Notwithstanding that reasonable belief, the referee questioned the client's ability, based on his limited educational background, to comprehend the intricacies of the legal issues involved and the circumstances surrounding his execution of the agreement.

¶ 34. As discipline for the professional misconduct she determined to have been established in this proceeding, the referee recommended that Attorney Gilbert's license to practice law be suspended for three years, rejecting the Board's position that license revocation is warranted. The referee explicitly based her recommendation on the egregious nature of Attorney Gilbert's misconduct, particularly in light of the fact that her client was "a vulnerable elderly man with many health problems and limited mental ability," Attorney Gilbert's failure to express remorse for the way she handled her client's assets, and the need to protect the public, the courts, and the legal system from any repetition of such misconduct by Attorney Gilbert or any other attorney. The referee's recommendation took into account as mitigating factors that Attorney Gilbert has not previously been disciplined for professional misconduct, enjoys a reputation for good character, and cooperated with the Board in the disciplinary proceeding. At the same time, the referee considered as aggravating factors the absence of evidence that Attorney Gilbert made a timely, good faith effort to make restitution or rectify the consequences of her misconduct, the presence of dishonesty, fraud, deceit and misrepresentation throughout her dealings

with the client, and the absence of any evidence of her rehabilitation or remorse for her conduct in representing that client.

¶ 35. In addition to the license suspension, the referee recommended that Attorney Gilbert be required to make restitution to the client in the amount of $84,800 for the excessive and unreasonable fees she paid herself. On the basis of the testimony of the Board's expert witness at a separate hearing held on the issue of restitution, the referee determined that a reasonable fee for Attorney Gilbert's services as attorney, the social worker tasks she performed, her paralegal services, running errands for the client—what the referee termed "fetching" services, and her bookkeeping services is $27,200. The referee recommended further that Attorney Gilbert be required to pay interest on the restitution at the legal rate from the date her fees were collected to a date to be determined by the court. In that respect, the referee observed that the client has been deprived of the use of his funds and Attorney Gilbert has had them at her disposal since August 1993.

¶ 36. In this appeal, Attorney Gilbert contended that there was not clear and satisfactory evidence to support the referee's conclusions that she engaged in professional misconduct in representing her client. We find no merit to that contention in respect to any of the eight specific conclusions of professional misconduct the referee reached.

¶ 37. First, contrary to Attorney Gilbert's assertion that the referee's conclusion in respect to her having made misrepresentations and rendered fraudulent billings for her services was based on only two instances, one involving the referee's apparent misreading of a numeral set forth on one of the billing

461

statements and the other in respect to her having had the client approve fee statements while he was hospitalized, the referee explicitly found that Attorney Gilbert made misrepresentations in her billings regarding meetings with the client that did not occur and that her billings contained duplicative entries. While the referee may have erred in deciphering one of Attorney Gilbert's handwritten entries, there is ample evidence in the record to support the referee's finding in respect to the misrepresentations in the billings submitted to the client. Moreover, the referee found not credible Attorney Gilbert's testimony that errors contained in the revision of her billing for March-April 1993 to include a category of "out-of-office" services had been made by a clerical person in her office whom she was unable to name. Also not credible to the referee was Attorney Gilbert's testimony contradicting the documentary evidence that showed her client having signed a billing statement on a date he was hospitalized.

¶ 38. Second, concerning her use of the $3000 cashier's check to purchase a television for her family, Attorney Gilbert acknowledged that she did not immediately volunteer the information during the Board's investigation that she had used the check for that purpose. Her assertions that she eventually admitted to having done so and that by the end of the investigation the Board knew she had and that her failure to have made the admission timely was the result of emotional stress are insufficient to render improper the referee's conclusion that she engaged in dishonesty, fraud, deceit or misrepresentation in the matter. The record establishes that Attorney Gilbert made misrepresentations to the client's successor attorney regarding her use of the cashier's check, first asserting that she had

purchased a large screen television for the client and then stating that the client probably signed for delivery of the television but she was unable to remember the matter. .

¶ 39. Even when she accounted for that check, Attorney Gilbert did so by labeling it an "unused money order," when in fact it was a cashier's check that she indeed used to purchase the television. The referee properly concluded that notwithstanding evidence of unidentified simultaneous $3000 credit and debit entries in the checkbook register of her client trust account and a handwritten notation on a copy of the cashier's check of a $3000 credit to the trust account, the client had no way of knowing what Attorney Gilbert was doing with his money. In that respect, the referee stated:

> Ms. Gilbert's explanation of the way she handled the $3000 credit was so convoluted that investigators, trained lawyers, and members of the various committees who heard this matter prior to the final hearing, were perplexed by the labyrinth which she had created. How then could [the client], with his limited mental ability, understand where his $3000 ended up? All he could do was rely upon Jill Gilbert's professional knowledge and conduct. He did so to his detriment.

¶ 40. Third, the referee properly concluded that Attorney Gilbert engaged in dishonesty, fraud, deceit, or misrepresentation by giving the Board the videotape that purported to show her client's execution of the case management agreement. Attorney Gilbert contended that she made no representations to the Board or to its investigator concerning her purpose in delivering that videotape but merely offered it because she

was required to disclose fully and fairly all facts to the Board during its investigation, and the videotape was information that was to be disclosed. That argument ignores the fact that the videotape itself was deceptive in that it purported to show the client's execution of the agreement when in fact he had signed it prior to the videotaping, a fact Attorney Gilbert sought to prevent the videotape from showing. Regardless of Attorney Gilbert's representations regarding it, the tape was not what it was intended and designed to be—a memorialization of the client's execution of the agreement following Attorney Gilbert's explanation of its terms. Attorney Gilbert was aware of its deceptive content when she gave the Board the tape but did not inform the Board of it.

¶ 41. Attorney Gilbert next argued that the referee erred when she failed to consider all of the factors listed in the rule of conduct, SCR 20:1.5(a),[7] to be con-

---

[7] SCR 20:1.5 provides, in pertinent part:

**Fees**

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

464

sidered in determining the reasonableness of a lawyer's fee. She contended that her "technical knowledge and professional insight" in developing a strategy to make her client eligible for government assistance to remain in his home, coupled with what she termed the "novel and complex" issues involved in his representation, rendered her fees reasonable. She further argued that the referee should have addressed the likelihood that her acceptance of the client's representation would preclude her other employment, the fees customarily charged by persons practicing elder law in the Milwaukee area at the same time, the client's insistence that she be available 24 hours per day, seven days per week, and the substantial financial gain her client would have realized if he had been found eligible for the assistance she was seeking to obtain for him.

¶ 42. Notwithstanding the testimony of the Board's expert that similar case management services were available in the Milwaukee area at a rate of $65 to $95 per hour and personal services at $10 per hour, it is Attorney Gilbert's contention that the referee improperly concluded that billing her client $125 per hour for case management and personal services was excessive. She insisted that her client understood the nature of the services she was providing and the basis of the fee she was charging, as evidenced by the fact that he reviewed all of her bills before they were paid. She contended further that it was not unreasonable for her to charge lawyer rates for nonlawyer services, a contention supported by the testimony of her expert witnesses—an attorney from Oklahoma experienced in elder law and a Wisconsin attorney experienced in lawyer ethics. In respect to the "fetching services" she performed for the client, Attorney Gilbert asserted that

---

(8) whether the fee is fixed or contingent.

for the most part they were merely incidental to her performance of other services or in some cases were provided on an emergency basis.

¶ 43. Regarding the fee she charged her client for the time spent consulting an ethics expert about the proposed case management agreement, Attorney Gilbert contended that she had done so to obtain advice on how to proceed with a specific agreement to benefit her client, not, as the referee concluded, to ascertain whether the terms of the agreement might constitute professional impropriety on her own part. She did not address the fact that she did not have the client pay the fee of that expert but paid it from her own funds.

¶ 44. The referee was presented with opposing views of the expert witnesses: the Board's expert, an attorney with 20 years of elder law practice experience in Wisconsin, testified that Attorney Gilbert's fees were unreasonable and grossly excessive; Attorney Gilbert's expert, an Oklahoma attorney unfamiliar with the government assistance program Attorney Gilbert was pursuing for her client, testified that those fees were reasonable. Assessing that testimony, the referee gave more weight to that of the Board's expert. In addition to his unfamiliarity with the government program that would have kept Attorney Gilbert's client in his home, assuming he were eligible and following the two-year waiting period, Attorney Gilbert's expert was unable to state whether Attorney Gilbert's plan to qualify her client for that program was an appropriate one. It was for the referee to determine the amount of weight to give to the conflicting testimony of the experts, and Attorney Gilbert has not shown that the referee's determination was erroneous.

¶ 45. Concerning the charge to her client for the time she spent consulting with the ethics attorney, the

referee properly concluded that the primary purpose of that consultation was not to obtain assistance in creating a plan that would render her client eligible for assistance but to ensure that her plan to have her client transfer all of his funds to her own account would not raise questions of her own ethical propriety. Accordingly, while it was proper to use her own funds to pay for the advice of the ethics expert, it was improper to charge the client for the time she spent in consultation with him.

¶ 46. Attorney Gilbert next argued that the referee improperly concluded that she failed to act with reasonable diligence and promptness in managing her client's affairs by allowing his checking account to become overdrawn and by failing to deposit a Medicare payment to his bank account. She asserted that the overdrawn status of the checking account was unintentional—the result of her having used the client's debit card to make purchases for him in the mistaken belief that it was a credit card. She claimed that the client suffered no harm by the error, for when she explained the situation to the bank, it refunded the charges for the overdrafts. As to the failure to deposit the Medicare check, while acknowledging that it was a mistake on her part, she insisted that it was an isolated instance and insufficient to support the referee's conclusion that she failed to act promptly on her client's behalf. There, too, she insisted that her failure to deposit the check did not result in any harm to the client, ignoring the fact that the client was deprived of the use of that money, as well as any interest it might have earned.

¶ 47. The referee also properly concluded that Attorney Gilbert did not keep her client reasonably informed of the status of his financial situation and explain the provisions of the proposed case manage-

ment agreement in such a way that he would be able to make informed decisions regarding the work she was doing on his behalf. We find unpersuasive Attorney Gilbert's arguments that the numerous billing statements she submitted to him for his "signature of approval" demonstrated that she had numerous discussions with him concerning his finances, that errors in one of her letters to him concerning deposits to and withdrawals from her trust account had no economic consequence to him or involved substantial sums of money, and that she had written her client a lengthy letter explaining the basis for the case management agreement, conferred with him about it, and left copies with him for his review prior to executing it. The referee found Attorney Gilbert's system of financial management complex and confusing, such that even the referee and counsel for the parties had difficulty understanding the documents she prepared purporting to show how funds were allocated among and distributed from several accounts. The referee found further that the client, who was aged and confused, was not given comprehendible documentation regarding the status of his accounts. In respect to the case management agreement, the referee found on the basis of the videotape that Attorney Gilbert did not explain its complex provisions to her client but merely read or summarized them hurriedly and amid chaotic surroundings.

¶ 48. Regarding her deposit into a client trust account $24,000 she claimed was fees she had earned prior to the execution of the case management agreement and her subsequent withdrawal of funds from that account as fees while a dispute existed regarding the services she had rendered to her client, Attorney Gilbert argued that the referee's conclusions that she

thereby violated the trust account rules are contradictory. First, she claimed that the $24,000 had been fully earned but that she was uncertain of its status because her client's illness delayed the execution of the case management agreement and her rate of compensation was not determined. Second, she contended that when she withdrew $10,800 from that account for fees she claimed to have earned prior to the execution of the agreement, no fee dispute existed. In the latter regard, she asserted that the grievance her client filed against her with the Board did not specify that it included a dispute over fees.

¶ 49. Those arguments have no merit. The referee properly concluded that Attorney Gilbert commingled her own funds with those of her client when she deposited money she claimed to have earned for services already rendered into the account she maintained for the deposit of client funds and subsequently took almost half of that deposit in four separate withdrawals over the eight months following her client's termination of her services, knowing there was a dispute concerning her handling of the client's funds as well as the fees she had charged him for her services. The client's successor attorney testified that Attorney Gilbert told her shortly after being terminated by her client that there was a dispute involving her handling of his funds.

¶ 50. We turn now to the issue of restitution. Attorney Gilbert argued that restitution is not appropriate because the value of her services was the subject of substantial dispute and because her former client can pursue his remedies elsewhere, presumably by filing an action in circuit court. We note here that at the close of the restitution phase of the disciplinary hearing, the referee urged the parties to come to an

agreement on a reasonable fee for Attorney Gilbert's services to the client, but they were unable to do so.

¶ 51. Attorney Gilbert also asserted that the opinion of the Board's expert witness, on which the referee relied for her recommendation, is an insufficient basis for ordering restitution. She contended that the expert's opinions were based on unestablished assumptions as to the nature and quality of the work she performed for the client. Contrary to Attorney Gilbert's assertion that the expert gave her opinion on the value of her services without having reviewed Attorney Gilbert's fee statements, the record shows that the expert testified that she had reviewed those fee statements prior to her testimony at the misconduct stage of the disciplinary hearing and that she based her opinion regarding the value of Attorney Gilbert's services on the breakdown of services Attorney Gilbert herself prepared in anticipation of the restitution phase of the proceeding.

¶ 52. Attorney Gilbert argued that the $27,200 the referee determined was a reasonable fee for the work she did for her client is "grossly inadequate" to compensate her for the services she performed at the client's request and is unsupported by any fair view of the evidence. Based on additional legal services that she contended the Board's expert should have included in arriving at her opinion and on the value of case management services to which the social worker she called testified, Attorney Gilbert asserted that she was entitled to $113,612—some $1600 more than she paid herself from the client's funds.

¶ 53. Attorney Gilbert also argued that, contrary to the referee's recommendation, she should not be required to pay interest on any restitution that she might be required to pay. In that respect, she urged the

court to adopt a test based on liquidated versus unliquidated damages and award interest only if damages resulting from an attorney's misconduct were a fixed and determined amount, one the attorney could have given to the client immediately, thereby preventing any interest from accruing. Pursuant to that test, Attorney Gilbert contended, she should not be required to pay interest because the amount of any excessive fees had not been determined nor was readily determinable when the client terminated her representation.

¶ 54. We find no merit to any of Attorney Gilbert's contentions in respect to the issue of restitution and decline to adopt the interest test she proposed. The Board's expert employed three methods to arrive at an opinion of what a reasonable fee would have been for the work Attorney Gilbert did for her client. Using those three methods, the expert opined that the value of Attorney Gilbert's services was $7140, $27,200, and in the range of $2700 to $5000. The referee chose the method that produced the valuation of $27,200, and it has not been shown nor does it appear to be unreasonable. Moreover, at the restitution hearing Attorney Gilbert offered no testimony of an elder law attorney regarding the reasonableness of her fees, although she had presented expert testimony at the earlier phase of the disciplinary proceeding in respect to the misconduct allegations. As to the other witnesses she produced, the ethics expert admitted having no experience in the practice of elder law, and the testimony of a medical social worker and of a certified public accountant was based on Attorney Gilbert's billing statements, uncorroborated information, and misrepresentations Attorney Gilbert had made to them regarding the validity and reliability of her time records. It was

proper, then, for the referee to rely on the unrefuted testimony of the Board's expert witness.

¶ 55. Having determined that the referee's conclusions regarding Attorney Gilbert's professional misconduct and the valuation of her services were properly drawn from the facts of record, we adopt those conclusions and the findings on which they are based. In most instances, the referee based those conclusions on her assessment of the credibility of the witnesses, consistently finding Attorney Gilbert's testimony not to be credible in light of other testimony and documentary evidence. In other respects, those conclusions were based on the referee's assessment of the relative weight of conflicting expert testimony, as to which the referee enunciated the bases on which she accepted the testimony of the Board's expert and rejected that of Attorney Gilbert's. While Attorney Gilbert correctly identified two instances in which the referee's factual findings were erroneous—mistaking the numeral "6" for a "1" on one line of one billing statement and describing the assisted living arrangement in which the client most recently resided as government-assisted—those errors are not of sufficient significance to render the referee's conclusions improper.

¶ 56. In determining the discipline to impose on Attorney Gilbert, we first consider the circumstances surrounding her misconduct. Here, over a period of less than six months representing a single client, Attorney Gilbert paid herself $112,000 for services she claimed to have provided during that time. Notwithstanding Attorney Gilbert's assertions that her client was manipulative and had falsely represented to the investigator after filing a grievance against her that some of his signatures on the fee statements were not his and that he had not received several of the items she

claimed to have purchased for him, the referee found the client to be "a vulnerable elderly man with many health problems and limited mental ability" who at times was confused. We also note the referee's concern with Attorney Gilbert's apparent lack of remorse for the harm she caused the client, despite her insistence that she had expressed remorse for what she termed "mistakes and errors of judgment."

¶ 57. In the disciplinary proceeding before the referee, the Board took the position that the egregious nature of Attorney Gilbert's professional misconduct in respect to a physically and mentally frail client warranted the revocation of her license to practice law. Rather than revocation, the referee recommended a three-year license suspension, which Attorney Gilbert contended is excessive. She asserted that the referee failed to give sufficient weight to several mitigating factors: her good character and reputation, the pro bono work she has performed, her cooperation in the Board's investigation in this matter, the fact that she has not been disciplined in the past, and the fact that she sought ethical advice during the course of her representation of the client.

¶ 58. Having considered the circumstances surrounding Attorney Gilbert's professional misconduct, including the greatly excessive fees she was paying herself from her client's funds, the rate at which she was charging him for nonprofessional services, the client's vulnerability owing to his mental and physical condition, and Attorney Gilbert's repeated resort to misleading statements and misrepresentations concerning what she had done for the client and with his funds, we determine that a two-year license suspension is the appropriate discipline to impose. That determination takes into account the mitigating factors of

Attorney Gilbert's good character and reputation and the fact that she has not been the subject of a prior disciplinary proceeding.

¶ 59. By misstated and fraudulent billings, mismanagement of client funds under her control, mishandling of the client's financial affairs, providing the Board with a videotape that itself was deceptive in what it purported to depict, and depositing into her client trust account funds she claimed she was entitled to as fees and then withdrawing them after the client had terminated her services and filed a grievance against her, Attorney Gilbert has shown a willingness to place her financial interests above the welfare of a client and has established a pattern of deception to keep her professional misconduct from being discovered. The suspension we impose is intended not only to impress upon Attorney Gilbert the gravity of her professional misconduct but also to put other attorneys on notice of the degree of seriousness with which this court views conduct of this nature. The public, especially the elderly, the mentally impaired, and the vulnerable, need and deserve to be protected from those who would use their professional position to reward themselves unjustly at the expense of their clients.

¶ 60. In addition to the suspension, we require Attorney Gilbert to make restitution to the client harmed by her misconduct as recommended by the referee, plus interest at the legal rate from the date on which her client terminated her representation. As the referee noted, the client has been deprived of the use of those funds, and Attorney Gilbert has had them at her disposal since August 1993.

¶ 61. Finally, we address Attorney Gilbert's objection to being required to pay in full the costs of this

disciplinary proceeding. She urged the court to prorate those costs on the basis of the Board's failure to establish by clear and satisfactory evidence four of the twelve counts of misconduct it had alleged in its complaint. As we have done in prior cases, we decline the invitation to reduce the costs to be assessed against an attorney in proportion to the number of misconduct allegations established. We also reject Attorney Gilbert's argument that she should not be assessed the costs incurred for the evidentiary hearing on the restitution issue because she considered it the result of the Board's untimely amendment of its pleadings to request restitution after discovery had been substantially completed. There is no merit to her assertion that the expenses incurred by the Board in dealing with the restitution issue greatly exceeded what it would have incurred had the issue of restitution been part of the original complaint. Attorney Gilbert's additional objection regarding a witness fee she claimed was grossly excessive is also rejected.

¶ 62. IT IS ORDERED that the license of Jill S. Gilbert to practice law in Wisconsin is suspended for a period of two years, effective August 16, 1999.

¶ 63. IT IS FURTHER ORDERED that within 60 days of the date of this order, Jill S. Gilbert make restitution as set forth in this opinion.

¶ 64. IT IS FURTHER ORDERED that within 60 days of the date of this order, Jill S. Gilbert pay to the Board of Attorneys Professional Responsibility the costs of this proceeding, provided that if the costs are not paid within the time specified and absent a showing to this court of her inability to pay the costs within that time, the license of Jill S. Gilbert to practice law in Wisconsin shall remain suspended until further order of the court.

¶ 65. IT IS FURTHER ORDERED that Jill S. Gilbert comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶ 66. JON P. WILCOX, J., did not participate.

¶ 67. WILLIAM A. BABLITCH, J. (*concurring in part, dissenting in part*). I agree with the majority opinion in all respects save one.

¶ 68. The referee concluded that Attorney Gilbert engaged in dishonesty, fraud, deceit, or misrepresentation "by offering (the Board) a videotape" that purported to show her client's execution of the case management agreement. The referee's characterization that Ms. Gilbert somehow intended to mislead the Board by giving them the tape ignores the fact that she was required to do so. There is no indication in this record that had she not been required to do so, she would have provided it anyway.

¶ 69. The majority recognizes this fact, but then asserts that the tape was not what it was intended and designed to be—a memorialization of the client's execution of the agreement. That may or may not be, but those are not the facts this alleged violation of SCR 20:8.4(c) is based upon.

¶ 70. The majority further justifies its approval by stating that in any event Ms. Gilbert did not inform the Board of its deceptive content. It is so utterly clear from witnessing the tape that the client had already signed it that it can scarcely be said that she should have informed the Board of this fact. She should be under no obligation to inform the Board of the obvious.

¶ 71. Accordingly, I would not adopt the referee's conclusion with respect only to the above matter.