In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST Jeffrey D. KNICKMEIER, Attorney at Law:

OFFICE OF LAWYER REGULATION, Complainant-Respondent,

v.

Jeffrey D. KNICKMEIER, Respondent-Appellant.

Supreme Court

*No. 02–2438–D. Oral argument April 1, 2004.— Decided July 21, 2004.*

2004 WI 115

(Also reported in 683 N.W.2d 445.)

For the respondent-appellant there were briefs by *Jeffrey D. Knickmeier,* McFarland, and oral argument by *Jeffrey D. Knickmeier.*

For the complainant-respondent there was a brief by *Frank M. Tuerkheimer, Jeffrey Schneider* and *LaFollette Godfrey & Kahn,* Madison, and oral argument by *Frank M. Tuerkheimer.*

¶ 1. PER CURIAM. Attorney Jeffrey D. Knickmeier (hereafter Knickmeier or respondent) has appealed from the referee's report including findings of fact and conclusions of law which was filed in this court on September 30, 2003. After a public hearing, the referee determined that of the 23 counts of misconduct alleged by the Office of Lawyer Regulation (OLR) in its complaint filed against Knickmeier, the evidence established, or Knickmeier admitted, that he had committed 21 of those separate counts. Specifically, Knickmeier admitted the violations alleged in 8 of the counts, and the referee, the Honorable Dennis Flynn, concluded

that the OLR had established by clear and convincing evidence Knickmeier's violations of the remaining counts except for two. Based on the 21 counts of misconduct by Knickmeier, the referee recommended that Knickmeier's license to practice law in this state be revoked.

¶ 2. On this appeal, Knickmeier does not specifically challenge the referee's findings nor does he assert that the evidence was insufficient to support these findings. Rather, Knickmeier's focus on appeal is on the procedures followed by the OLR in pursuing this disciplinary matter, especially what Knickmeier perceives to have been the improper and unconstitutional temporary suspension of his license to practice law pursuant to SCR 22.21 as ordered by this court on June 14, 2001.[1]

---

[1] On February 19, 2001, the OLR, by its director, filed a motion requesting this court to temporarily suspend Knickmeier's license pursuant to SCR 22.21(1). Under that rule, this court, after giving the attorney an opportunity to show cause and respond to the OLR's motion, may temporarily suspend an attorney's license " . . . where it appears that the attorney's continued practice of law poses a threat to the interest of the public and the administration of justice." After OLR's motion was filed, this court ordered Knickmeier to show cause and respond which he did on March 13, 2001. In that response, Knickmeier conceded that he had violated certain supreme court rules as the OLR's motion had alleged. Specifically, he admitted his failure to maintain all of the required internal accounting ledgers under SCR 20:1.15; he also admitted "some commingling of funds"; and he admitted a failure to produce a complete comprehensive accounting to his client on demand. In this response, however, Knickmeier asserted that these were mere accounting violations. Knickmeier suggested that rather than temporarily suspending his license under SCR 22.21(1), this court should impose certain monitoring conditions on his license pending completion of the then-pending

¶ 3. In addition to challenging the temporary suspension, on this appeal, Knickmeier also disputes the referee's revocation recommendation. According to Knickmeier, his violations of the Rules of Attorneys Professional Responsibility[2] would warrant, at most, a six-month to one-year suspension of his license to practice law.

¶ 4. We determine that the referee's findings of facts are not clearly erroneous. *See In re Disciplinary Proceedings Against Sosnay,* 209 Wis. 2d 241, 243, 562 N.W.2d 137 (1997). Those findings were supported by the clear, satisfactory, and convincing evidence presented at the public hearing held in this disciplinary matter. After our de novo review of the referee's conclusions of law, *see In re Disciplinary Proceedings Against Carroll,* 2001 WI 130, ¶ 29, 248 Wis. 2d 662, 636 N.W.2d 718, we agree with the referee that the extensive pattern of misconduct Knickmeier acknowledges, as well as the misconduct as

OLR investigation of the grievance filed against Knickmeier by a former client on September 21, 2000.

Rejecting Knickmeier's suggestion that conditions be imposed on his license pending the OLR's investigation, this court instead on June 14, 2001, temporarily suspended Knickmeier's license pursuant to SCR 20:21(1). His license remains suspended under this rule.

[2] Effective October 1, 2000, Wisconsin's attorney disciplinary process was substantially restructured. The name of the body responsible for investigating and prosecuting cases involving attorney misconduct was changed from the Board of Attorneys Professional Responsibility (BAPR) to the Office of Lawyer Regulation and the supreme court rules applicable to the lawyer regulation were also revised in part. Some of the conduct underlying this case arose prior to October 1, 2000. However, the complainant in this case will be referred to as the OLR. All references to supreme court rules will be to the current version of the supreme court rules unless otherwise noted.

found by the referee, reflects serious, wide-spread, and repeated violations of the Rules of Attorneys Professional Responsibility warranting the revocation of Knickmeier's license to practice law in this state. Accordingly, we adopt the referee's findings of fact and conclusions of law and we revoke Knickmeier's license to practice law in this state. We further agree with the referee that Knickmeier should be required to pay to the OLR all the costs connected with this disciplinary proceeding now totaling $27,085.04.

¶ 5. Jeffrey D. Knickmeier was admitted to practice law in this state on September 15, 1978, and since then has engaged in the general practice of law in the McFarland-Madison area. He has twice previously been privately reprimanded for professional misconduct.

¶ 6. The genesis of the instant disciplinary proceeding against Knickmeier occurred when J.R., an individual Knickmeier had represented since 1997, complained in September 2000 that Knickmeier had borrowed several thousand dollars from J.R. to purchase an airplane and later a motorcycle and that Knickmeier had not repaid the money. J.R. also complained to OLR that Knickmeier had spent more than $45,000 of J.R.'s money Knickmeier had been holding in his trust account while J.R. was incarcerated. Further, according to J.R., despite written agreements and assurances, Knickmeier had never provided the promised accountings for the expenditures of the monies and had little or no documentation to substantiate or corroborate his explanations for the expenditures.

¶ 7. In response to the OLR's request, Knickmeier submitted several explanations and post hoc attempts to document the expenditures of J.R.'s monies from his trust account. The OLR, however, found Knickmeier's responses and explanations to be inadequate; conse-

quently, on February 19, 2001, OLR filed a motion in this court requesting the temporary suspension of Knickmeier's license pursuant to SCR 22.21(1). On June 14, 2001, this court (Bradley, J., dissenting), granted the motion and temporarily suspended Knickmeier's license to practice law in this state; his license remains suspended.[3]

¶ 8. On September 13, 2002, the OLR filed in this court its complaint (amended on October 11, 2002) alleging that Knickmeier had committed 23 counts of misconduct. Knickmeier subsequently filed his answer

---

[3] On August 26, 2003, Knickmeier commenced an action in the United States District Court for the Western District of Wisconsin challenging this temporary suspension and seeking declaratory and injunctive relief. He named the OLR, its director, the state, the attorney general and this court as defendants. He also sought monetary damages from the OLR director. Knickmeier challenged his temporary suspension on due process and equal protection grounds. He also alleged that the supreme court rules prohibiting an attorney whose license has been suspended from engaging in the practice of law in this state, *see* SCR 22.26(2) and SCR 22.27(3), are unconstitutionally overbroad insofar as they purport to regulate practice before federal courts or federal agencies.

On October 7, 2003, the federal district court, relying on the abstention doctrine, denied Knickmeier's motion for a preliminary injunction and dismissed his complaint without prejudice. *See Middlesex County Ethics Comm'n v. Garden State Bar Assoc.,* 457 U.S. 423 (1982). Knickmeier appealed that dismissal to the United States Court of Appeals for the Seventh Circuit and that court on May 3, 2004, affirmed the Federal District Court's judgment dismissing Knickmeier's federal lawsuit; however, relying on the *Rooker-Feldman* doctrine, *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983), the Seventh Circuit modified that dismissal to reflect a dismissal for lack of subject matter jurisdiction.

admitting some of the allegations but denying others. In that answer, and during the hearing before the referee, Knickmeier admitted violating 8 of the 23 counts. As noted, after the public hearing, the referee concluded that the OLR had proven by clear and convincing evidence all of the remaining counts except for two. Then, based on Knickmeier's 21 counts of misconduct, the referee recommended that Knickmeier's license to practice law in this state be revoked.

¶ 9. On this appeal Knickmeier reiterates that a six-month to one-year suspension should be the appropriate sanction for his misconduct because, according to Knickmeier, his actions were motivated by altruism rather than avarice. Knickmeier's basic argument in his altruism defense is that his actions were actually compelled in order to save his client, J.R., from financial ruin and also to protect the community from J.R.'s ongoing drug and alcohol consumption. Knickmeier observes that under SCR 20:1.2,[4] he could not assist his client in conduct that was criminal. Knickmeier maintains on this appeal that J.R.'s drug habit and spendthrift pattern of behavior necessitated Knickmeier's actions in order to protect J.R. from his own vices. Moreover, according to Knickmeier, in the year preceding the filing of this grievance, J.R. had squandered $60,000 to $70,000, mostly on alcohol and drugs and on one day, had spent more than $4500 on cocaine. Knickmeier claims that his duty and desire was to protect J.R. and his assets, and thus, all of Knickmeier's actions, misguided as some turned out to be, were for J.R.'s

---

[4] SCR 20:1.2 provides, in pertinent part: "(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, . . . ."

benefit. On this appeal Knickmeier faults the OLR for refusing to recognize the altruistic basis for his actions.

¶ 10. Knickmeier also argues on appeal that several of the misconduct counts should have been dismissed because the OLR investigator had failed to include exculpatory information in her report to the OLR director and then to the Preliminary Review Committee (PRC) as the rules require. According to Knickmeier, although he borrowed money from J.R. to purchase an airplane, the PRC should have been informed that J.R. had retained a security interest in the airplane (which had an agreed value of $17,250) which secured the loan balance. Knickmeier asserts that the OLR's investigative report submitted to the PRC should have pointed out that in light of the value of the collateral and J.R.'s secured interest in it, J.R.'s funds were never really at risk in this loan transaction.

¶ 11. In addition, Knickmeier contends that the OLR investigative report submitted to the PRC should have included information about J.R.'s spendthrift habits, including his spending on drugs and alcohol. Because that report failed to note these two important pieces of exculpatory information, Knickmeier asserts this disciplinary proceeding should have been dismissed at least with respect to these counts which were in dispute before the referee.

¶ 12. Knickmeier also contends that he should not be required, as the referee recommended, to pay the full costs of this disciplinary proceeding.

¶ 13. Knickmeier's specific arguments will be discussed in more detail in the following portions of this opinion which outline the specific counts of misconduct Knickmeier has been found to have committed.

78

## COUNTS 1 AND 2—AIRPLANE LOAN

¶ 14. Count 1 alleged a violation of SCR 20:1.8(a).[5] In general, this rule prohibits a lawyer from entering into a business transaction with a client unless the terms are fair and reasonable to the client; in addition, the terms must be fully disclosed and transmitted to the client in the manner which can be reasonably understood by the client. The client then must be given a reasonable opportunity to seek the advice of independent counsel and consent in writing to the transaction.

¶ 15. Count 2 alleged a violation of SCR 20:8.4(c).[6] This rule, among other things, states that it is professional misconduct for a lawyer to engage in conduct involving "dishonesty, fraud, deceit or misrepresentation."

¶ 16. The testimony at the hearing before the referee established that Knickmeier borrowed $12,000 from J.R. on September 3, 1998, in order to purchase an airplane for himself. J.R. did not have a pilot's license.

---

[5] SCR 20:1.8(a) provides:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

> (3) the client consents in writing thereto.

[6] SCR 20:8.4(c) provides: "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

At the time of this transaction, Knickmeier executed a promissory note which required the repayment of the loan within 12 months with monthly payments of $200 at an interest rate of 15 percent per year.

¶ 17. The referee determined that although that agreement was in writing as required by SCR 20:1.8, the loan nevertheless violated that rule because J.R.'s written agreement to this transaction had not been obtained until approximately 12 days after Knickmeier had obtained the $12,000 from him. In addition, the referee found that: The airplane had been purchased solely for Knickmeier's benefit; the loan had not been repaid within the time specified; and the terms of the contract had not been complied with. According to the referee, the fact that the airplane was adequate collateral for the loan was irrelevant because J.R. was unable to use his economic resources as freely as he desired since the loan had not been repaid within the agreed upon timeframe. Furthermore, the referee noted that Knickmeier had acknowledged that he was aware that he was required to obtain the signed consent of his client before taking the loan from him.

¶ 18. The referee was not persuaded by Knickmeier's altruism defense or his argument that he was merely acting to protect J.R. from wasting his assets on alcohol and drug addictions. The referee observed that statutory procedures set out for guardianships in Wis. Stat. ch. 880 (2001–02),[7] were available for dealing with a spendthrift client. *See* Wis. Stat. § 880.03. According to the referee, Knickmeier's claim that he took J.R.'s money to protect it from being wasted "rings hollow" in light of the fact that the

---

[7] All subsequent references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

airplane only benefited Knickmeier and most of the loan payments were made only after J.R. had filed his grievance and the OLR had filed the misconduct complaint against Knickmeier. The referee concluded that the OLR had established by clear, satisfactory, and convincing evidence that Knickmeier had violated SCR 20:1.8(a) by knowingly engaging in an impermissible business transaction with his client.

¶ 19. Similarly, with respect to Count 2, based on the evidence and testimony at the hearing, the referee concluded that Knickmeier had failed to disclose to J.R. at the time of the $12,000 airplane loan that Knickmeier himself had a checkered financial history—to wit, Knickmeier had made multiple Chapter 13 filings in federal bankruptcy court and at the time of this loan, Knickmeier's debts totaled more than $100,000. According to the referee, information regarding the lawyer's creditworthiness, or lack thereof, would be important information for a client to have in order to make an informed decision about whether to consent or reject the lawyer's request for a loan.

¶ 20. Likewise, the referee was not persuaded by Knickmeier's argument that he had acted out of altruism in trying to protect J.R. from himself; instead, the referee found that Knickmeier had intentionally acted to conceal his own poor credit status with intent to mislead J.R. into lending him the $12,000. Thus, the referee concluded that the OLR had established by clear, satisfactory, and convincing evidence that Knickmeier had violated SCR 20:8.4(c) by engaging in intentional fraud, dishonesty, deceit or misrepresentation in obtaining the airplane loan.

## COUNTS 3, 4, 5, AND 6—DEPLETION OF TRUST ACCOUNT

¶ 21. Count 3 alleged the second of the six counts in the OLR complaint charging Knickmeier with violating SCR 20:8.4(c).

¶ 22. Count 4 alleged a violation of SCR 20:1.15(d)[8] which in general, requires a lawyer who is in possession of property in which the lawyer and another person claim an interest, to keep that property as trust property until there is an accounting and severance of the disputed interest. Knickmeier admitted this count of misconduct.

¶ 23. Count 5 alleged a violation of SCR 20:1.15(b).[9] Knickmeier also admitted his violation of this rule which requires a lawyer, upon the request of a client, to render a full accounting regarding property held in trust.

---

[8] SCR 20:1.15(d) provides:

(d) When, in the representation, a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be treated by the lawyer as trust property until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall continue to be treated as trust property until the dispute is resolved.

[9] SCR 20:1.15(b) provides:

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render a full accounting regarding such property.

¶ 24. Count 6 alleged a violation of SCR 20:1.15(e).[10] Knickmeier also admitted his misconduct with respect to this rule which in general, requires the lawyer to keep complete records of trust account funds and other trust property including a disbursement journal listing the date and payee of each disbursement with all disbursements being paid by check.

¶ 25. In this grouping of counts relating to the depletion of J.R.'s monies held by Knickmeier in his trust account, only Count 3 which alleged fraud, misrepresentation, deceit or dishonesty, was at issue at the hearing before the referee because as noted, Knickmeier had acknowledged his misconduct as alleged in Counts 4, 5, and 6.

---

[10] SCR 20:1.15(e) provides:

(e) Complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include: (i) a cash receipts journal, listing the sources and date of each receipt, (ii) a disbursements journal, listing the date and payee of each disbursement, with all disbursements being paid by check, (iii) a subsidiary ledger containing a separate page for each person or company for whom funds have been received in trust, showing the date and amount of each receipt, the date and amount of each disbursement, and any unexpended balance, (iv) a monthly schedule of the subsidiary ledger, indicating the balance of each client's account at the end of each month, (v) a determination of the cash balance (checkbook balance) at the end of each month, taken from the cash receipts and cash disbursement journals and a reconciliation of the cash balance (checkbook balance) with the balance indicated in the bank statement, and (vi) monthly statements, including canceled checks, vouchers or share drafts, and duplicate deposit slips. A record of all property other than cash which is held in trust for clients or third persons, as required by paragraph (a) hereof, shall also be maintained. All trust account records shall be deemed to have public aspects as related to the lawyer's fitness to practice.

¶ 26. The evidence the referee heard established that in early 1999 while Knickmeier was representing J.R. in connection with J.R.'s mother's estate, certain property was sold resulting in a $45,785 payment to J.R. That money was deposited by Knickmeier in his trust account because J.R. was, at that time, incarcerated. On March 1, 1999, Knickmeier traveled to the prison where J.R. was incarcerated and obtained J.R.'s signature on an agreement which set forth guidelines for Knickmeier's supervision of the trust account monies. That agreement, which Knickmeier also signed, provided, among other things, that Knickmeier would not disburse any funds from the account unless previously authorized by J.R. either orally or in writing.

¶ 27. In his testimony before the referee, Knickmeier asserted that it was his intent when he signed that agreement to protect these funds from being wasted by J.R. on alcohol, drugs, and criminal activities. The referee, however, also heard testimony that only three months after the agreement was signed, the trust account funds were totally depleted by Knickmeier. By June 5, 1999, J.R.'s money in the account had been expended and the guidelines in the agreement between Knickmeier and J.R. had not been followed from the very first day. The referee found that on March 1, 1999, Knickmeier withdrew more than $500 from the account in order to pay his phone bill, and the following day he withdrew an additional $838.83. Thus, according to the referee, by March 2, 1999, Knickmeier had already disbursed more to himself from J.R.'s trust monies than he was entitled to receive under his agreement with J.R.

¶ 28. In addition, the referee determined that Knickmeier had extended loans to himself from the trust account funds without any documentation. Specifically, on two separate occasions, Knickmeier had

withdrawn $1100 for himself which he later described as a "principal advance." That first $1100 "principal advance" occurred on May 10, 1999, as part of a $3000 withdrawal from the trust account made that day by Knickmeier; the second $1100 "principal advance" was made on May 20, 1999, as part of another $3200 withdrawal made by Knickmeier from the trust account on that day. Knickmeier acknowledged at the hearing before the referee that he had not obtained J.R.'s prior consent for those two "principal advances." According to Knickmeier he thought that was unnecessary because he considered these advances to be part of an earlier loan.

¶ 29. Although Knickmeier had not prepared a contemporaneous document reflecting these disbursements, after J.R.'s grievance was filed, and in response to the OLR's request for information and documentation, Knickmeier drafted a document then identifying these two $1100 withdrawals as "principal advances."

¶ 30. The referee also noted that Knickmeier had taken a loan from J.R.'s trust account monies in order to finance the purchase of one-half interest in a motorcycle; Knickmeier had also paid his office phone bill and had purchased athletic event tickets using money from the trust account. The referee determined that all of those transactions had occurred without Knickmeier having first obtained J.R.'s authorization in writing as the March 1, 1999, agreement required. Based on the evidence, including OLR's analysis of Knickmeier's later-constructed trust account records, the referee found that Knickmeier had repeatedly used the trust account funds for his own, not J.R.'s purposes. The referee wrote:

> · Respondent's position of acting to protect these funds for [J.R.] is not supported by the credible evi-

dence. These funds were not protected in any way and Respondent used this money often for his own benefit. He also failed to provide any meaningful accounting as was repeatedly requested by [J.R.]. When the accounting was provided, it was after misconduct claims had been filed. The withdrawal of funds by Respondent from this $45,785 deposit occurred without the consent of [J.R.]. The testimony of [J.R.] is credible on this point as it is corroborated by communications to or about Respondent . . . .

¶ 31. According to the referee, Knickmeier had violated SCR 20:8.4(c) as alleged in Count 3 by withdrawing funds from J.R.'s trust account for personal purposes without any notice to or consent from J.R., and by not keeping current records of trust account withdrawals. The referee determined that this constituted dishonesty, fraud, deceit or misrepresentation. Furthermore, characterizing the March 1, 1999, guideline agreement as "fraudulent" from the time it was signed, the referee found that Knickmeier had, from the very first day of the agreement, used it to obtain personal access to J.R.'s funds. The referee reasoned that Knickmeier's actions in concealing what had happened to the money after the account had been depleted, supported the conclusion that Knickmeier " . . . had intentionally and without consent used much of the trust money for his own purposes and not those of his client." Specifically, Knickmeier had used the funds to pay his law office phone bills, to purchase athletic event tickets, and the one-half interest in a motorcycle.

¶ 32. As noted, Knickmeier admitted his misconduct as alleged in Counts 4, 5, and 6 of the OLR's complaint. He acknowledged that he had made disbursements from the trust account before an accounting and severance of interest had occurred, and that he

had paid himself funds that he should have held in trust until he provided J.R. with an accounting, something he also failed to do. Knickmeier also admitted that, as alleged in Count 5, he had failed to timely respond to J.R.'s request for an accounting and, as alleged in Count 6, he had failed to keep the records required for trust account funds including a disbursements journal listing the date and payment of each disbursement and a listing of the trust account checks he had written to himself. Although Knickmeier acknowledged this misconduct with respects to Counts 4, 5, and 6, he claimed these violations were "technical" and "de minimus" violations which did not harm his client.

### COUNT 7—FOOTBALL TICKETS

¶ 33. Count 7 alleged another violation of SCR 20:8.4(c).

¶ 34. The facts supporting this count alleging that Knickmeier had engaged in fraud, misrepresentation, dishonesty or deceit, included Knickmeier's use of $653 of the trust account funds to purchase tickets to Green Bay Packer and University of Wisconsin Badger football games. The evidence revealed that J.R. had used some of the Badger tickets and one of the Packer tickets for a total of $202; the remaining tickets, worth $451, however, were used personally by Knickmeier or sold by him.[11]

¶ 35. Based on the testimony regarding this count, the referee determined that Knickmeier had

---

[11] At the hearing before the referee, Knickmeier and the OLR entered into a stipulation with respect to certain facts. This stipulation asserted that J.R. had used tickets totaling $202 and Knickmeier had used tickets totaling $451.

The check register which Knickmeier constructed after J.R.'s grievance had been filed, listed the $653 as "fees." Later,

violated SCR 20:8.4(c) by buying athletic event tickets for his own use and enjoyment which he paid for from funds belonging to his client which were kept in the trust account. The referee determined that this conduct was "intentional" and that Knickmeier's dishonesty was further demonstrated by his failure to keep a current account journal of disbursements for the trust account.

## COUNTS 8 AND 9—MOTORCYCLE LOAN

¶ 36. Count 8 alleged another violation of SCR 20:1.8(a).

¶ 37. Count 9 alleged another violation of SCR 20:8.4(c).

¶ 38. The testimony before the referee established that on April 20, 1999, Knickmeier withdrew $10,800 from J.R.'s trust account and then used that money to purchase a motorcycle which Knickmeier and J.R. were to jointly own even though J.R. did not have a license to operate a motorcycle. Knickmeier's share in the motorcycle purchase was financed by a $5400 loan (half of the $10,800 he had withdrawn) from the trust account funds. The remaining $5400 from that withdrawal paid for J.R.'s one-half ownership of the motorcycle. At the hearing before the referee, Knickmeier acknowledged that he had not discussed his own financial background with J.R. prior to making this loan to himself from J.R.'s monies in the trust account; Knickmeier also acknowledged that he knew at the time that J.R. did not have a valid license to operate the motorcycle.

¶ 39. The referee also heard testimony that in August of 1999 Knickmeier sold the motorcycle and

_____

Knickmeier acknowledged that that entry was in error and that the money had actually been spent on the athletic tickets, not fees.

received $8000 for it. Knickmeier then split that $8000 equally between himself and J.R. but Knickmeier did not pay off any of his prior $5400 indebtedness from his $4000 share of the proceeds from the motorcycle sale.

¶ 40. Based on the evidence and the testimony he had heard, the referee determined that although the promissory note executed by Knickmeier with respect to the motorcycle loan was fair and reasonable in its terms, and even though J.R. had apparently consented to the transaction in a contemporaneous writing, the problem was that J.R.

> . . . was not able to make an informed or considered decision as to whether his economic resources should or should not be deployed in this loan. [J.R.] testified that he was often intoxicated (Respondent corroborated) and had a poor memory as to this transaction. Respondent did not keep contemporaneous account records in his Trust Account regarding the loan to himself of $5,400. He also did not repay the loan in accord with the contract. This result was predictable. Respondent acted intentionally to use [J.R.'s] money to get a motorcycle for himself. He had an obligation as a lawyer seeking a loan from a client to make full disclosure of his financial status.

¶ 41. The referee concluded that by intentionally failing to disclose "very relevant" facts—i.e., Knickmeier's multiple and recent bankruptcy filings and his then outstanding indebtedness of over $100,000— Knickmeier had prevented his client from making an informed decision on whether or not to extend the $5400 loan and J.R. had not been given a fair opportunity to make an independent decision regarding the loan.

¶ 42. Thus, the referee concluded that with respect to Count 8, Knickmeier had engaged in misconduct as proscribed by SCR 20;1.8(a) by improperly

entering into a business transaction with his client without disclosing important, negative financial information about himself to the client. The result, according to the referee, was that J.R. was "intentionally misled" into participating in the business transaction. The referee asserted that his conclusion concerning Knickmeier's intent was bolstered by the fact that Knickmeier had defaulted on the loan, had not provided J.R. with the requested accounting, and then, when the motorcycle was sold, did not use any of his share of the proceeds to pay off the loan.

¶ 43. Similarly, with respect to Count 9, the referee concluded that when Knickmeier subsequently sold the motorcycle and did not use any of his share of the sale proceeds to pay down his outstanding loan balance, he violated the rule which proscribes a lawyer from engaging in fraud, misrepresentation, dishonesty or deceit. The referee reasoned that even if Knickmeier had properly obtained the loan for the motorcycle (which the referee determined he had not) Knickmeier still had no right to use the sale proceeds for any other purposes other than paying down the outstanding loan balance without his client's consent. According to the referee, the evidence clearly established Knickmeier's fraud and his intent not to repay the loan. The referee concluded that Knickmeier's sole goal was to get money from his client in any way he could for his own ends.

### COUNTS 10, 11, AND 12—BAIL AND EVIDENCE MONEY

¶ 44. Count 10 alleged a violation of SCR 20:1.15(a).[12] That rule requires a lawyer to hold in trust, separate from a lawyer's own property, the prop-

---

[12] SCR 20:1.15(a) provides:

erty of a client that is in the lawyer's possession. Knickmeier admitted this count of misconduct.

¶ 45. Count 11 alleged a violation of SCR 20:1.15(b). Knickmeier also admitted his violation of this rule which requires a lawyer to deliver promptly to a client any funds a client is entitled to receive and to render a full accounting regarding such property.

¶ 46. Count 12 alleged another violation of SCR 20:8.4(c) which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

(a) A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and third persons that is in the lawyer's possession in connection with a representation or when acting in a fiduciary capacity. Funds held in connection with a representation or in a fiduciary capacity include funds held as trustee, agent, guardian, personal representative of an estate, or otherwise. All funds of clients and third persons paid to a lawyer or law firm shall be deposited in one or more identifiable trust accounts as provided in paragraph (c). The trust account shall be maintained in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The trust account shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. No funds belonging to the lawyer or law firm, except funds reasonably sufficient to pay or avoid imposition of account service charges, may be deposited in such an account. Unless the client otherwise directs in writing, securities in bearer form shall be kept by the attorney in a safe deposit box in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The safe deposit box shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. Other property of a client or third person shall be identified as such and appropriately safeguarded. If a lawyer also licensed in another state is entrusted with funds or property in connection with an out-of-state representation, this provision shall not supersede the trust account rules of the other state.

91

¶ 47. At the hearing before the referee Knickmeier admitted and pled no contest to the misconduct as alleged in Counts 10 and 11 of the OLR complaint. The referee resolved Count 12 against Knickmeier based on the evidence at the hearing. These three counts related to bail money and cash seized from J.R. (apparently at the time of his arrest). There is no dispute that J.R. was entitled later to the return of the bail money and the seized cash which totaled $2200. Knickmeier retrieved those funds after J.R. went to prison; however, of that $2200, Knickmeier disbursed approximately only $700 on J.R.'s behalf. Of the remaining amount totaling $1471, Knickmeier admitted that he had deposited some of that money into his own personal savings account and used a portion of it for other personal matters. In addition, Knickmeier acknowledged at the hearing that he had not contemporaneously maintained trust account records with respect to this money; in fact, he had not developed the trust account records until after J.R.'s grievance was filed and he was required to provide documentation to the OLR.

¶ 48. After hearing the testimony and seeing the evidence on this cluster of misconduct counts, the referee described these actions "stealing" and found it to be an act of dishonesty for Knickmeier to take the $2200 belonging to J.R. and to use any portion of that money for his own purposes without giving the funds to J.R. or depositing them into his trust account. According to the referee, the clear, satisfactory, and convincing evidence, established that Knickmeier had violated SCR 20:8.4(c) by taking money belonging to his client and by not depositing it into his trust account or giving it directly to his client. The referee determined that

92

Knickmeier's actions in this respect constituted dishonesty, fraud, deceit or misrepresentation in violation of SCR 20:8.4(c).

## COUNTS 13, 14, 15, 16, AND 17—EAST JOHNSON STREET PROPERTY

¶ 49. Count 13 alleged a violation of SCR 20:1.7(b).[13]

¶ 50. This rule, in general, prohibits a lawyer from acting in the face of a conflict of interest with his client. The rule provides that a lawyer shall not represent a client if that representation may be materially limited by the lawyer's responsibility to another client or to a third person or by the lawyer's own interest unless certain conditions are met including the client's consent in writing, to the lawyer's continued representation.

¶ 51. Count 14 alleged a violation of SCR 20:1.3.[14] This rule requires a lawyer to act with reasonable diligence and promptness in representing a client.

¶ 52. Count 15 alleged another violation of SCR 20:1.15(a).

---

[13] SCR 20:1.7(b) provides:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents in writing after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

[14] SCR 20:1.3 provides: "Diligence. A lawyer shall act with reasonable diligence and promptness in representing a client."

¶ 53. This rule requires a lawyer to hold in trust, separate from the lawyer's own property, property of a client that is in the lawyer's possession.

¶ 54. Count 16 alleged a violation of SCR 20:1.15(b). However, the referee determined that the evidence presented at the hearing was insufficient to establish that Knickmeier had violated this rule which requires the lawyer to promptly notify the client of the receipt of funds; accordingly, the referee dismissed this count.

¶ 55. Count 17 alleged another violation of SCR 20:8.4(c).

¶ 56. This was the fifth count in the OLR's complaint alleging that Knickmeier engaged in conduct involving dishonesty, deceit, or misrepresentation.

¶ 57. This cluster of misconduct counts involved Knickmeier's conflict of interest regarding his handling of J.R.'s house on East Johnson Street in Madison, while J.R. was incarcerated. At the same time Knickmeier was representing J.R. and seeking tenants for the house, Knickmeier also represented D.S. Knickmeier rented J.R.'s house to D.S. without revealing to either J.R. or D.S. that the other person was his client too. Knickmeier rented J.R.'s house to D.S. after he had just recently represented D.S. in an eviction action brought against her for nonpayment of rent; at that time he was also representing D.S. in a small claims action brought against her. Knickmeier did not tell J.R. of that fact nor of D.S.'s past rental history.

¶ 58. The evidence established that at the time J.R. was incarcerated in the fall of 1999, he and Knickmeier agreed that Knickmeier would take care of J.R.'s Johnson Street residence; J.R. asked Knickmeier,

among other things, to pay the property taxes on the residence as they became due in 2000.

¶ 59. In the summer of 2000, Knickmeier arranged for another one of his clients, D.S., to rent J.R.'s property. Knickmeier, had represented D.S. in March 2000 in an eviction action brought against her in connection with her tenancy at a different location. Knickmeier was at that time also representing D.S. in a small claims action brought against her for nonpayment of medical fees. At the time he rented J.R.'s house to D.S., she remained his client.

¶ 60. The testimony presented at the hearing before the referee revealed that although Knickmeier had negative information regarding D.S. as a tenant, he did not disclose that information to J.R. Knickmeier explained at the hearing that he did not disclose this negative information because he believed it was privileged information based on his lawyer/client relationship with D.S.

¶ 61. Testimony before the referee also established that at the time Knickmeier negotiated the lease agreement between his clients, J.R. and D.S., Knickmeier was indebted to both: he had owed $2000 to D.S. and he had previously borrowed money from J.R. for the purchase of an airplane and a motorcycle. As was true with respect to the loans Knickmeier had obtained from J.R., Knickmeier had not informed D.S. prior to obtaining the $2000 loan from her, that Knickmeier's own financial history included numerous bankruptcy petitions; nor had he disclosed to her his current indebtedness or the fact that at that time, he was in default on his loans from J.R.

¶ 62. Knickmeier had borrowed $2000 from D.S. in April of 2000; Knickmeier acknowledged at the hearing before the referee that he had not provided D.S.

with a full disclosure of his financial history nor had he told her about the default status of the airplane and motorcycle loans from J.R. Again, according to Knickmeier, he had not disclosed that information because he thought it was confidential and privileged; he also thought he did not have to do so. Those failures on his part to disclose this information formed the basis for the misconduct alleged in Count 17 of OLR's complaint.

¶ 63. The testimony before the referee also established that when D.S. moved into the Johnson Street premises, she paid $600 in rent to Knickmeier. Knickmeier then used $300 of that payment to reduce his indebtedness on the outstanding $2000 loan he had previously obtained from her. Knickmeier made no trust account entries at that time indicating his use of the $300 rental payment that belonged to his client J.R. Those facts were the basis for the misconduct alleged in Count 15.

¶ 64. Count 16 alleged a violation of SCR 20:1.15(b). It was alleged that Knickmeier had not notified J.R. of the receipt of rent money and security deposit from D.S. The referee determined, however, that the credible evidence established that Knickmeier in fact notified J.R. of the receipt of the security deposit and rental payment from D.S. Therefore, the referee dismissed Count 16.

¶ 65. The referee made several other specific findings. For example, with respect to Count 14, the referee determined that although Knickmeier had paid the insurance premiums on the residence, Knickmeier had failed to pay the property taxes that were due on the property. The evidence before the referee indicated that the Dane County Treasurer had sent J.R. a notice of real estate taxes due in the amount of $2695.95. Knickmeier replied to that tax notice on behalf of J.R.

acknowledging receipt of the tax due form but asserting that even though J.R. had substantial assets, " ... we are having a liquidity problem at the moment."

¶ 66. The referee further determined that it was Knickmeier's responsibility, under his agreement with J.R., to manage J.R.'s residence and to pay the property taxes while J.R. was incarcerated. According to the referee, the cash shortage J.R. was experiencing was the result of Knickmeier's actions in depleting J.R.'s funds and defaulting on his loans from J.R. which totaled $17,000. Knickmeier's failure to pay the property taxes put J.R.'s property at risk. This, according to the referee, amounted to Knickmeier's violation of SCR 20:1.3 because he failed to act with diligence and promptness in paying the property taxes and failed to protect his client's property. This referee believed that these failures were compounded by Knickmeier's failure to provide current and complete accountings and by his telling his incarcerated client that the tax matter was of no consequence.

¶ 67. Similarly, with respect to Count 15, the referee concluded that the evidence established that Knickmeier had violated SCR 20:1.15(a) because he failed to keep J.R.'s property (i.e., the rental payments made by D.S.) separate from Knickmeier's own property. The testimony established that Knickmeier had received money from D.S. for the rent and a security deposit but then he had used those funds for himself without first depositing them into the trust account for disbursal to J.R.

¶ 68. With respect to Count 17, the referee determined that Knickmeier had violated SCR 20:8.4(c) because he had failed to disclose to D.S. his own negative financial history before he borrowed money from her. According to the referee, this amounted to

obtaining money from the client by deceit and dishonesty; furthermore, the referee found that Knickmeier's repeated acts of obtaining client funds and then not repaying the debt, established that his deceitful and dishonest conduct was intentional. The referee wrote that Knickmeier's actions constituted "an intentional fraud upon [D.S.]."

¶ 69. The referee was not persuaded by Knickmeier's arguments that disclosure was not required because D.S. was receiving a fair interest rate on the loan, because the loan was secured by two motorcycles, and that in any event, the $2000 loan was subsequently repaid. According to the referee, that argument missed the point because " . . . It was unreasonable and a fraud for the lawyer to obtain this loan without advising the client of material, negative information which was essential to the decision of the client on whether or not to grant the loan."

## COUNT 18—J.R.'S MOTHER'S ESTATE

¶ 70. Count 18 alleged a violation of SCR 20:1.3 but the referee dismissed this count concluding that the evidence did not establish that Knickmeier had not acted with reasonable diligence and promptness as OLR had alleged.

## COUNT 19—KEEPING CLIENT INFORMED AND CURRENT

¶ 71. Count 19 alleged a violation of SCR 20:1.4(a).[15] This rule requires that a lawyer keep the

---

[15] SCR 20:1.4(a) provides: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

¶ 72. The referee's findings with respect to this count were based on evidence concerning Knickmeier's failure, despite repeated requests from J.R., to inform J.R. about the status of his accounts and to provide J.R. with an accounting of the funds Knickmeier had disbursed from the trust account. The referee observed that approximately two years had elapsed from the time J.R. first made his repeated requests for accountings until Knickmeier finally submitted a statement to J.R. The referee determined that the billing records Knickmeier finally sent to J.R. were substantially late; furthermore, Knickmeier's failure to provide the information J.R. requested was intentional and this, according to the referee, was compounded by the fact that Knickmeier had not maintained regular and current account books.

## COUNT 20—FAILURE TO COOPERATE

¶ 73. Count 20 alleged a violation of SCR 22.03(2).[16] This rule, in general, requires a lawyer to fully and fairly disclose all facts to the OLR regarding the alleged misconduct being investigated.

¶ 74. Based on the evidence presented at the hearing, the referee determined that after J.R.'s grievance was filed, OLR sent Knickmeier a letter asking him to provide certain information and data on or before October 20, 2000. Knickmeier's response, however, was found to be incomplete, and when notified of that, Knickmeier asked for an extension of time. That extension was granted and OLR was specific about what remaining data Knickmeier needed to provide. Knickmeier thereafter submitted some additional data

as requested on several subsequent occasions including a report he submitted to OLR on November 20, 2000. The referee determined, however, that the information Knickmeier provided was insufficient and did not comply with the OLR's specific request for data regarding his representation of J.R., particularly the financial and account records. Knickmeier finally provided that information to the OLR on November 24, 2000.

¶ 75. The referee, based on the evidence and testimony he heard, determined that Knickmeier had violated SCR 22.03(2) by not responding timely to reasonable requests for data during an inquiry involving a grievance investigation. Moreover, the referee determined that Knickmeier had not established good cause for his delay in submitting the relevant data to the OLR during the investigation.

## COUNTS 21, 22, AND 23—TRUST FUND VIOLATIONS

¶ 76. Count 21 alleged another violation of SCR 20:1.15(a). At the hearing Knickmeier admitted violating this rule and entered a no contest plea to this count.

---

[16] SCR 22.03(2) provides:

(2) Upon commencing an investigation, the director shall notify the respondent of the matter being investigated unless in the opinion of the director the investigation of the matter requires otherwise. The respondent shall fully and fairly disclose all facts and circumstances pertaining to the alleged misconduct within 20 days after being served by ordinary mail a request for a written response. The director may allow additional time to respond. Following receipt of the response, the director may conduct further investigation and may compel the respondent to answer questions, furnish documents, and present any information deemed relevant to the investigation.

¶ 77. Count 22 alleged a violation of SCR 20:1.15(e). Knickmeier also admitted his violation of this rule and pled no contest to this count before the referee.

¶ 78. Count 23 alleged a violation of SCR 20:1.15(a). Again, Knickmeier, at the hearing before the referee, acknowledged his violation of this rule and pled no contest to this count.

¶ 79. With respect to Counts 21 and 22, Knickmeier acknowledged that he had repeatedly drawn trust account checks to pay for matters that were Knickmeier's personal expenses. For example, he paid for secretarial services, application fees for his daughter's college entrance examination, and similar matters from the trust account funds. Knickmeier also acknowledged that he had not kept complete records of his trust account and trust fund property including a cash receipts journal and disbursement journal. Knickmeier maintained, however, that this was merely a "technical" and "de minimus" violation which caused no harm to his client.

¶ 80. With respect to Count 23, Knickmeier acknowledged that he had commingled funds that had belonged to another one of his clients, G.M.

¶ 81. After finding that Knickmeier had committed the misconduct as alleged in 21 of the 23 counts in the OLR's complaint, the referee addressed what discipline should be imposed for Knickmeier's numerous acts of misconduct. The referee rejected Knickmeier's asserted altruism defense and in 18 separate paragraphs in his report, the referee discussed and rejected Knickmeier's various arguments. According to the referee Knickmeier failed to understand that his actions amounted to "opportunistic or predatory behavior toward his client's economic resources." Furthermore, the referee described Knickmeier being unrepentant as

101

demonstrated by his claim that he was the "victim" and that he had "suffered enough."[17]

¶ 82. The referee recommended that Knickmeier's license be revoked. He explained that his rec-

---

[17] Knickmeier had submitted a written closing argument and memorandum to the referee. In that document Knickmeier described himself as "honest, credible and forthright." He also argued that his "temporary" suspension from June 2001, had been devastating to his livelihood and to his solo practice. According to Knickmeier, his actions were motivated and compelled by what he viewed as the requirement that a lawyer must protect his client and not engage in any illegal activities on behalf of his client. Knickmeier repeated his assertion that his actions were motivated by his obligation to keep his client, J.R. from dissipating his inheritance, and that without Knickmeier's intervention, J.R. would have spent his money on drugs and alcohol. In his written argument Knickmeier asserted:

> The reality is that Respondent acted in a fashion—however unorthodox—that kept [J.R.] alive and protected him. He was saved from overdose, robbery, police bullets, and who knows what else. Putting more money in [J.R.'s] hands would be like giving someone a loaded gun to commit suicide.

> The reality is that the ultimate goals of the rules—the protection of the public and the preservation of the client—were largely achieved by Respondent. [J.R.], and every man, woman and child who walk the streets of the East side of Madison are greatly indebted to the Respondent. Respondent didn't walk away or wash his hands—to this day. He has made a noble sacrifice, and we cannot lose sight of what is important. The individual rules are servants of a greater, more cosmic good—the avoidance of criminality and protection of the public.

Knickmeier also wrote that no matter how " . . . wonderful . . . [he] has been for the community, for God, country and the client . . . " it could not be overlooked that he had acknowledged and admitted to numerous rule violations. Knickmeier suggested that as a sanction for his "gross failures" with respect to record keeping and delay in billings and accountings, a six-month suspension of his license might be appropriate under the circumstances.

ommendation for revocation was based on the need to protect the public; further, according to the referee, in a case like this where the violations of the rules were multiple and serious, where prior discipline had been imposed, and where remorse apparently did not exist, the severe sanction of revocation was necessary and appropriate. The referee wrote: "This is a case where, sadly, revocation is needed to provide protection from a lawyer who most assuredly would continue his misconduct in the future. He views his clients and their assets as a source of funds to be obtained for his own benefit through fraud and deceit."

## KNICKMEIER'S APPELLATE ARGUMENTS

¶ 83. On appeal, Knickmeier's primary focus is on the referee's recommendation for revocation of his license to practice law. Knickmeier does not identify and challenge specific findings by the referee as not being supported by credible evidence. Instead, Knickmeier mounts procedural attacks on the OLR's complaint and the referee's findings. He also vigorously contends that because of the "temporary" suspension he has endured since this court's June 14, 2001, order, which he insists amounted to a clear violation of his constitutional rights, that the only appropriate remedy for this deprivation of his rights would be the dismissal of this disciplinary proceeding.

¶ 84. More specifically, Knickmeier first contends that this disciplinary proceeding should be dismissed because the OLR failed to plead compliance—and to actually comply—with the requirements of SCR 22.03(3)[18] and SCR 22.06(1).[19] Knickmeier maintains that under SCR 22.03(3) the OLR staff is required to include in the investigative report submitted to the

OLR director " . . . all relevant *exculpatory* and inculpatory information obtained . . . ." (Emphasis added.) Likewise, he maintains that under SCR 22.06(1) the OLR director is then required to submit the investigative reports to the PRC and such reports must include " . . . all relevant *exculpatory* and inculpatory information obtained . . . ." (Emphasis added.)

¶ 85. According to Knickmeier, the material submitted by the OLR investigative staff to the director, and in turn, the material submitted by the director to the PRC, did not include exculpatory information because there was nothing about J.R.'s security interest in the airplane which secured the loan balance Knickmeier owed to J.R., nor did the reports note that the airplane was valued at $17,250 which was more than the loan balance. Knickmeier complains that the reports actually suggested that that loan was unsecured.

¶ 86. Knickmeier further complains that the reports failed to include additional exculpatory information concerning J.R.'s spendthrift habits and his drug and alcohol problems. Knickmeier believes that this information is exculpatory because it went to establish Knickmeier's altruism defense—i.e., that he was acting in the best interest of J.R. and with intent to protect J.R. from financial ruin as well as his client's continuing drug and alcohol addictions. According to Knickmeier,

[18] SCR 22.03(3) provides: "(3) Staff involved in the investigation process shall include in reports to the director all relevant exculpatory and inculpatory information obtained."

[19] SCR 22.06(1) provides: "(1) The director shall submit investigative reports, including all relevant exculpatory and inculpatory information obtained and appendices and exhibits, if any, pursuant to SCR 22.05(1)(d) to the chairperson of the preliminary review committee. The chairperson shall assign each matter to a panel for consideration."

104

because this information justified and explained his actions, it should have been presented as exculpatory material to both the OLR director and then to the PRC so that informed decisions about whether to proceed with this disciplinary matter could be made.

¶ 87. Furthermore, Knickmeier asserts that the OLR's investigator's admission that she did not "sift or winnow" any of the information but rather simply presented everything she had obtained, including what Knickmeier insists was exculpatory information, was insufficient. According to Knickmeier, simply turning over every piece of information to the director and then to the PRC, does not provide the decision makers with appropriate and complete staff analysis and recommendations, and does not highlight any exculpatory information.

¶ 88. Knickmeier's arguments are not persuasive. We agree with the referee that the OLR director, as well as the PRC, had all of the investigative information before it including Knickmeier's claimed exculpatory information. The investigator submitted every report and every piece of information she had obtained in her investigation. Included in that submission was all the information Knickmeier now insists was exculpatory.

¶ 89. Moreover, we find nothing in the rules to support Knickmeier's jurisdictional challenge. He maintains that compliance with the provision that exculpatory information must be submitted and that OLR must plead such compliance, is a jurisdictional requirement that has to be established before the disciplinary case can proceed. We believe, as the referee noted, that because the OLR investigator had turned over everything she had to the director and then to the PRC, all

the alleged "exculpatory" information was in fact presented; therefore, the rules were complied with. And, as noted, we find nothing in the rules to suggest that these requirements are jurisdictional and compliance has to be specifically pled.

¶ 90. In addition, it is not clear that the information Knickmeier has identified as exculpatory is actually exculpatory in nature. This information does not go to prove Knickmeier's innocence on the misconduct counts nor does it tend to support any affirmative defense. At best, it simply provides his explanation for his actions. While this information might be relevant to the issue of the appropriate sanction to be imposed, we do not agree that submission of this "exculpatory" information was a jurisdictional prerequisite for the OLR's decision to file and pursue these misconduct charges against Knickmeier.

■

¶ 91. On this appeal, Knickmeier also contends that his motion to dismiss and/or motion for summary judgment with respect to Counts 2, 3, 7, 9, 12, and 17, should have been granted by the referee. The rule underlying all those counts is SCR 20:8.4(c) which, as noted, precludes a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. Knickmeier argues that these six counts in the OLR complaint alleging violations of this rule were based on alleged *omissions* by him—i.e., his failure to advise his client about various matters. Knickmeier maintains that none of those six counts alleged any actual intent to deceive or misrepresent by him. According to Knickmeier, all prior disciplinary cases involving this rule have included an allegation that the lawyer had the intent to deceive and/or misrepresent. Because the OLR complaint in this case did not allege that he

had acted with intent to deceive or misrepresent, Knickmeier insists that these six counts should have been dismissed.

¶ 92. Furthermore, Knickmeier complains that the referee improperly found that Knickmeier had engaged in fraud or intentional misrepresentation. Again, Knickmeier insists that the referee could not make such findings because this case was brought solely on the theory of Knickmeier's omissions, not on any theory that he acted with fraudulent intent or intent to misrepresent. Thus, Knickmeier argues that no matter what the referee might have thought the evidence established, the referee should have been constrained by the omission theory as pled by the OLR in its complaint. Therefore, it follows, according to Knickmeier, that Counts 2, 3, 7, 9, 12, and 17 should have been dismissed.

¶ 93. We reject this argument because as the OLR notes, SCR 20:8.4(c) does not simply prohibit "intentional, fraudulent" conduct; rather, that rule is stated in the disjunctive and prohibits conduct which involves any one of the four acts described—i.e., "dishonesty, deceit, fraud *or* misrepresentation." Furthermore, we agree with the OLR that deceitful omissions of relevant information constitute dishonest conduct within the scope of SCR 20:8.4(c). *See In re Disciplinary Proceedings Against Urban,* 2002 WI 63, 253 Wis. 2d 194, 645 N.W.2d 612.

¶ 94. We also reject Knickmeier's underlying argument—which he never fully articulates—that the referee was constrained to find the facts only as pled in the OLR complaint. This suggested limitation ignores the wide latitude and authority given to the referee

107

under SCR 22.16.[20] Among other things, that rule provides that the referee has powers of a judge trying a

---

[20] SCR 22.16 provides: Proceedings before a referee.

(1) The referee has the powers of a judge trying a civil action and shall conduct the hearing as the trial of a civil action to the court. The rules of civil procedure and evidence shall be followed. The referee shall obtain the services of a court reporter to make a verbatim record of the proceedings, as provided in SCR 71.01 to 71.03.

(2) The hearing shall be held in the county of the respondent's principal office or, in the case of a non-resident attorney, in the county designated by the director. The referee, for cause, may designate a different location.

(3) Unless otherwise provided by law or in this chapter, the hearing before a referee and any paper filed in the proceeding is public.

(4)(a) If in the course of the proceeding the respondent claims to have a medical incapacity that makes the defense of the proceeding impossible, the referee shall conduct a hearing and make findings concerning whether a medical incapacity makes defense of the proceeding impossible. The referee may order the examination of the respondent by qualified medical or psychological experts.

(b) All papers, files, transcripts, communications, and proceedings on the issue of medical incapacity shall be confidential and shall remain confidential until the supreme court has issued an order suspending the attorney's license to practice law, or has otherwise authorized disclosure.

(c) If the referee finds no medical incapacity that would make the defense of the proceeding impossible, the referee shall proceed with the misconduct action.

(d) If the referee finds that a medical incapacity makes the defense of the proceeding impossible, the referee shall file a report promptly with the supreme court. If the court disapproves the referee's finding, the court shall direct the referee to proceed with the misconduct action. If the court approves the referee's finding, the court shall abate the misconduct proceeding and suspend the respondent's license to practice law for medical incapacity until the

civil action; also the referee's request to conduct the disciplinary hearing as a bench trial in a civil action at which the rules of civil procedure "shall be followed." One pertinent rule of civil procedure to be followed at a disciplinary hearing before a referee would be Wis. Stat. § 802.09(2). This statute permits the amendment of pleadings to conform to the proof. This statute also directs the judge (or referee) to freely allow the pleadings to be amended where the presentation of the merits would be subserved and where there would be no prejudice to the objecting party. In this case, the referee's ruling rejecting Knickmeier's motion to dismiss these six counts, can be viewed as the referee's decision to "freely allow" an amendment of these pleadings and the referee's recognition that permitting proof and making findings on any of the four actions—dishonesty, deceit, fraud or misrepresentation—would not and could not, prejudice Knickmeier because the rule is stated in the disjunctive.

██

¶ 95. Knickmeier also challenges, as excessive, the discipline recommended by the referee—revocation of Knickmeier's license. According to Knickmeier, the referee ignored at least 15 specific positive and mitigat-

court orders reinstatement of the attorney's license under SCR 22.36. Upon reinstatement, the court shall direct the referee to proceed with the misconduct action.

(5) The office of lawyer regulation has the burden of demonstrating by clear, satisfactory and convincing evidence that the respondent has engaged in misconduct.

(6) Within 30 days after the conclusion of the hearing or the filing of the hearing transcript, whichever is later, the referee shall file with the supreme court a report setting forth findings of fact, conclusions of law regarding the respondent's misconduct, if any, and a recommendation for dismissal of the proceeding or the imposition of specific discipline.

ing points Knickmeier had identified in order to demonstrate that at most, a six-month to one-year suspension of his license would be appropriate as a sanction for his misconduct. Those specific points included: (1) Knickmeier's claimed cooperation with the OLR investigation; (2) his cooperative attitude and demeanor; (3) his expressed concern for his clients' welfare; (4) the fact that his client actually profited from the transactions; (5) the fact that Knickmeier "saved" his client's life; (6) the fact that Knickmeier charged reasonable fees for his services; and (7) the fact that Knickmeier has "suffered enough" because his license has already been suspended and he has done no legal work since June of 2001.

¶ 96. According to Knickmeier, in other disciplinary cases involving much more egregious behavior by the lawyer, this court has not revoked the lawyer's license. *See, e.g., In re Disciplinary Proceedings Against Gilbert,* 227 Wis. 2d 444, 595 N.W.2d 715 (1999). Furthermore, Knickmeier complains that here the referee wrongly criticized him for not being repentant and for showing no remorse. He should not be so faulted, Knickmeier believes, because he has simply exercised his right to have a hearing in this matter and to put OLR to its proof regarding the claims against him. Knickmeier insists that this should not be viewed as a demonstration of no remorse or an unrepentant attitude on his part.

¶ 97. Again, we are not persuaded by Knickmeier's arguments. Under the circumstances of this case, we do not think the referee's recommendation for revocation of Knickmeier's license to practice law is excessive. We believe, as did the referee, that Knickmeier's actions (even if we were only to consider

the eight counts of misconduct which Knickmeier admitted) fully warrant the revocation of his license to practice law in this state. Although this court is guided by prior cases when determining the appropriate level of discipline to be imposed for a lawyer's misconduct, prior cases are neither controlling nor limiting on this court's discretion. In any event, we note that the *Gilbert* case which Knickmeier has cited, is distinguishable from this situation because the respondent in *Gilbert* had no prior disciplinary contacts. Here, Knickmeier has twice been privately reprimanded for professional misconduct.

¶ 98. Moreover, we note there are several prior cases where this court has revoked the license of the lawyer to practice law based on acts similar to Knickmeier's misconduct. In several instances, revocation has resulted where the lawyer committed many fewer acts of misconduct than Knickmeier has committed here. *See, e.g., In re Disciplinary Proceedings Against Martinez,* 225 Wis. 2d 433, 591 N.W.2d 866 (1999); *In re Disciplinary Proceedings Against Sheehan,* 224 Wis. 2d 44, 588 N.W.2d 624 (1999); *In re Disciplinary Proceedings Against Warmington,* 212 Wis. 2d 657, 568 N.W.2d 641 (1997); and *In re Disciplinary Proceedings Against Cassidy,* 172 Wis. 2d 600, 493 N.W.2d 362 (1992).

¶ 99. Although we agree with the referee that given the seriousness and widespread pattern of misconduct committed by Knickmeier, revocation of his license to practice law in this state is fully justified, we note that Knickmeier has not, by his own assertion, practiced law since June 14, 2001, the date of this court's order temporarily suspending his license under SCR 22.21. Under these circumstances, we believe it is

appropriate, as we have done in the past, to order this revocation to be retroactive to the June 14, 2001, date when this court temporarily suspended Knickmeier's license. We have imposed such retroactive discipline in prior cases. *See In re Disciplinary Proceedings Against Meagher,* 2003 WI 132, 266 Wis. 2d 18, 669 N.W.2d 733; *In re Disciplinary Proceedings Against Calhoun,* 196 Wis. 2d 665, 538 N.W.2d 797 (1995); *In re Disciplinary Proceedings Against Mittelsteadt,* 113 Wis. 2d 718, 335 N.W.2d 880 (1983); and *In re Disciplinary Proceedings Against Glasschroeder,* 113 Wis. 2d 672, 335 N.W.2d 621 (1983). This retroactive revocation of Knickmeier's license as of June 14, 2001, means that he will be able to petition for reinstatement of his license, should he seek to do so, at any time commencing five years after that date. *See* SCR 22.29(2).[21]

---

[21] Retroactive revocation of his license commencing as of the date of his temporary suspension makes it unnecessary for this court to now address Knickmeier's arguments that the temporary suspension deprived him of due process and equal protection. Those issues and arguments were raised in Knickmeier's federal action and we consider these issues to be moot for the purposes of this disciplinary proceeding. A decision by this court on these constitutional challenges to this court's authority under SCR 22.21 to order the temporary suspension of a lawyer's license to practice law, would have no practical legal effect upon the existing controversy in the instant case in light of the retroactive revocation of Knickmeier's license. *See State ex rel. LaCrosse Tribune v. Circuit Court,* 115 Wis. 2d 220, 228, 340 N.W.2d 460 (1983), and cases cited therein. We acknowledge that there are exceptions to the mootness doctrine including the situation where the constitutionality of a statute is involved, *see Doering v. Swoboda,* 214 Wis. 481, 253 N.W. 657 (1934); however, we decline to now address Knickmeier's challenges to this court's rule and authority in the context of this current disciplinary proceeding against Knickmeier. There is no

¶ 100. On this appeal, Knickmeier also challenges the referee's recommendation that the costs of these proceedings be assessed against him. First, because he believes the entire proceeding should be dismissed for various reasons, he asserts that no costs at all should be assessed against him. We have already rejected Knick-

dispute that this court has the authority to impose appropriate discipline—including revocation—for a lawyer's misconduct. *See* SCR 21.16.

This court has held that a lawyer's constitutional right to due process in a disciplinary proceeding involves only the right to prior notice of the charges, the right to prepare and defend against the charges, and the right to a full hearing on the charges. *State v. Hersh,* 73 Wis. 2d 390, 243 N.W.2d 178 (1976); *see also In re Disciplinary Proceedings Against Eisenberg,* 117 Wis. 2d 332, 344 N.W.2d 169 (1984); and *In re Complaint Against Seraphim,* 97 Wis. 2d 485, 495, 294 N.W.2d 485 (1980). Before Knickmeier's license was temporarily suspended, he was given notice of the pending charges and was given an opportunity to respond and show cause to the OLR's motion for his temporary suspension, and he did so. He also subsequently had a full evidentiary hearing before a referee after the OLR's complaint was filed. In both his responses to OLR's motion for temporary suspension and in his hearing before the referee, Knickmeier admitted various acts of misconduct (ultimately, he acknowledged his misconduct as alleged in 8 of the 23 counts in OLR's complaint). Consequently, the dispute in this case has always focused primarily on the appropriate discipline to be imposed as a sanction for Knickmeier's misconduct.

Ordering the revocation of Knickmeier's license to run from the date of his temporary suspension moots the constitutional issues Knickmeier attempts to present on this appeal because, in effect, he will have suffered no prejudice from this court's alleged deprivation of his constitutional rights when it temporarily suspended his license. He will be able to petition for reinstatement in less than two years. We therefore deem these issues and arguments to be moot and decline to address them.

meier's claim that the matter should be dismissed in its entirety, thus, this argument needs no discussion.

■

¶ 101. Knickmeier also asserts that because 2 of the 23 counts alleged in the OLR's complaint were dismissed by the referee, the total costs should be reduced to reflect those dismissals. And he maintains that in light of the OLR's intransigence throughout this proceeding and its refusal to negotiate with him concerning an appropriate sanction for his misconduct, this court should deny the OLR's request for costs in its entirety.

¶ 102. We reject Knickmeier's arguments in all respects. First, we note that in many prior cases, full costs have been imposed against the lawyer-respondent in a disciplinary proceeding even though several of the misconduct claims were dismissed by the referee or by this court. For example, in *Gilbert,* this court awarded full costs to the OLR even though only 8 of the 12 claims of misconduct brought in that case were sustained.

¶ 103. Moreover, this court has repeatedly declined to apportion costs based on the number of misconduct counts sustained. *See In re Disciplinary Proceedings Against Pangman,* 216 Wis. 2d 440, 460–61, 574 N.W.2d 232 (1998) and *In re Disciplinary Proceedings Against Eisenberg,* 144 Wis. 2d 284, 423 N.W.2d 867 (1988).

¶ 104. We find, in light of Knickmeier's egregious pattern of misconduct, that it is entirely appropriate for this court to require him to pay the full costs of this disciplinary proceeding now totaling $27,085.04. Pursuant to SCR 22.24 this court may assess all of the costs against a respondent in a disciplinary proceeding in

which misconduct has been found. The fees and expenses incurred by the OLR as itemized in its statement of costs submitted to this court are reasonable and fully documented. Knickmeier, as a repeat violator of this court's rules, should pay all of these costs.

¶ 105. IT IS ORDERED that the license of Jeffrey D. Knickmeier to practice law in this state is revoked effective as of this court's order temporarily suspending his license to practice law in this state dated June 14, 2001.

¶ 106. IT IS FURTHER ORDERED that within 60 days of the date of this order, Jeffrey D. Knickmeier shall pay to the Office of Lawyer Regulation the costs of this disciplinary proceeding provided that if the costs are not paid within the time specified, and absent a showing to this court of his inability to pay the costs within that time, the license of Jeffrey D. Knickmeier to practice law in Wisconsin shall remain revoked until further order of this court.

¶ 107. IT IS FURTHER ORDERED that Jeffrey D. Knickmeier comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been revoked.

¶ 108. DIANE S. SYKES, J., did not participate.

¶ 109. DAVID T. PROSSER, J., concurs.

¶ 110. ANN WALSH BRADLEY, J., dissents.